(No. 67319.— ▮▮▮▮▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARK JOHNSON, Appellant.

*Opinion filed November 27, 1991.—Rehearing*
*denied February 3, 1992.*

Charles Schiedel, Deputy Defender, of Springfield, and Steven Clark, Assistant Defender, of Chicago, both of the Office of the State Appellate Defender, for appellant.

Roland W. Burris, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Terence Madsen, Assistant Attorney General, of Chicago, and Renee Goldfarb and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Mark Johnson, was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), and aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14). The same jury that convicted defendant found that he was eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), and further found that there were no mitigating factors sufficient to preclude a sentence of death. The trial court accordingly sentenced defendant to death. That sentence was stayed (134 Ill. 2d R. 609(a)) pending defendant's direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603). We affirm defendant's convictions and sentence.

At trial, the State presented the testimony of C.L., the victim of the charged sexual assault and an eyewit-

ness to the charged murder. C.L. testified that she was introduced to defendant on November 26, 1985, by her uncle, Willie Robinson. Defendant was introduced to her as "Allen," defendant's middle name. At approximately 1:30 p.m. on that date, C.L., Robinson and defendant went to an apartment at 3921 West Huron in Chicago. C.L. had recently been evicted from the apartment and the three intended to pack and remove some of C.L.'s possessions. Soon after their arrival, Robinson left the apartment to purchase some alcohol. Robinson returned approximately 15 minutes later and he and defendant sat and drank alcohol for about 30 minutes. Robinson then left the apartment to purchase more alcohol.

Upon Robinson's second departure, defendant told C.L. that he wanted to have sex with her. When C.L. refused, defendant put on gloves and told C.L. to "take off them clothes because I'm king and whatever I say go." C.L. saw that defendant had a knife in his hand. C.L. disrobed and defendant tied her hands and feet. After defendant had tied C.L., Robinson knocked on the apartment's outer door. Defendant told C.L. to be quiet and opened the door. When Robinson asked what was going on, defendant grabbed Robinson from behind and cut his throat. The two struggled and defendant repeatedly stabbed Robinson. When the struggle was over, Robinson lay on the floor near the door.

Defendant then forced C.L. to perform repeated acts of oral sex on him. In between these sex acts, defendant would return to Robinson's body and continue cutting his throat. Defendant attempted anal intercourse with C.L., but was unsuccessful, and raped her vaginally instead. Defendant then proceeded to urinate on C.L.

Defendant ordered C.L. to again perform oral sex on him, threatening to do to her what he had done to her uncle. Following this, defendant returned to Robinson's body and cut his throat a fourth time. After this fourth

mutilation, C.L. was forced to lick the blood off the knife defendant had used. Defendant then looked out the apartment's window, checking to see that no one was watching the activities in the apartment. After making this check, defendant ordered C.L. to perform oral sex on Robinson. Defendant then forced C.L. to perform a final act of oral sex on him.

Defendant told C.L. that it did not matter if she reported him, telling her "I did this many times. If I have to I run from state to state." Defendant referred to himself as the "King of Leos" and informed C.L. that he was keeping her alive so that she could write a book about him. Defendant left the apartment at approximately 10 or 11 p.m., returning 35 minutes later for a few minutes and then leaving again. C.L. waited in the apartment for awhile before freeing herself, after which she covered herself with a coat and ran to a neighbor's residence. There C.L. telephoned her aunt and the police.

Police officer Michael Rose testified that he responded to a report of a rape and stabbing at 3921 West Huron at approximately 10:50 p.m. on November 26, 1985. Upon arriving at the apartment, Officer Rose found Robinson dead on the kitchen floor near the apartment's outer door. Officer Rose testified that C.L. was dressed only in a coat and that she was panicky and had a difficult time communicating.

Detective Thomas Sherry arrived at the scene soon after Officer Rose. Detective Sherry attempted to interview C.L. but she was withdrawn and did not respond well. After being informed that the perpetrator's first name was "Allen," Detective Sherry attempted to locate him. Detective Sherry went to an apartment on the 3400 block of Jackson Boulevard where he spoke to Donna Randolph, who identified "Allen" as Allen Johnson. Detective Sherry left his business card with Randolph with

instructions that she have Allen Johnson contact him if she heard from him.

On December 5, 1985, defendant was arrested on an unrelated rape charge. Defendant was searched in connection with the arrest and two knives were recovered. One of those knives was consistent with the type of knife used to inflict the stab wounds found on Robinson. While defendant was in custody for this arrest, Detective Sherry saw the business card he had left with Donna Randolph in defendant's possession. Detective Sherry advised defendant of his constitutional rights and informed him that he wanted to question him about a murder on the 3900 block of Huron. Defendant proceeded to tell the detective about the murder of Robinson. Assistant State's Attorney Frank Edwards thereafter arrived to question defendant about the Robinson murder. Defendant talked to Edwards and agreed to reduce his confession to writing only if Edwards would agree to transcribe it verbatim and allow defendant to read and check each line as it was written. Edwards complied and defendant's written statement was taken. Defendant's written statement was introduced into evidence at trial.

Defendant's account of the events of November 26, 1985, generally corroborated C.L.'s testimony, with a few exceptions. Unlike C.L., defendant claimed that he and C.L. had engaged in what was initially consensual intercourse, though he later admitted to "making" C.L. perform oral sex and to tying her up. Defendant's explanation of the events that precipitated the stabbing of Robinson also differed from that of C.L. Defendant stated that C.L. "tried to go into [his] pocket" and that he began beating her. Defendant claimed that it was when Robinson attempted to intervene in the beating that defendant cut his throat. Other than those differences, defendant's statement corroborated C.L.'s testi-

mony. Defendant described his attempts to cut Robinson's head off by "sawing back and forth on his neck." Defendant also stated that he told C.L. that he was letting her live so that she could "write the story" and call it the "King of Leos" because he was "the king." Defendant further admitted that he returned to the apartment after initially leaving because he had forgotten his address book. Edwards testified that defendant was very "matter-of-fact" when he gave the statement. Edwards stated that defendant reviewed the statement upon its completion and, while signing it, added a final sentence which read, "I want the death penalty."

Dr. Robert H. Kirschner, a Cook County medical examiner, testified that he performed an autopsy on the body of Willie Robinson and that the cause of Robinson's death was multiple stab wounds. Dr. Kirschner stated that he found 15 stab wounds on Robinson's head and neck, including two large slashing wounds across the neck, as well as numerous other wounds on Robinson's head, chest and extremities. Dr. Kirschner further testified that the fact that there was evidence of bleeding from each of the wounds indicated that each was inflicted while Robinson was still alive.

Following the presentation of the above testimony, the State rested. Defendant attempted to establish the affirmative defense of insanity at trial. In support of this defense, defendant called Dr. Robert A. Reifman, a psychiatrist and director of the Psychiatric Institute of the Circuit Court of Cook County. Dr. Reifman testified that he examined defendant in March of 1987 after defendant had been charged with the instant murder and rape, a second murder and a second rape. Dr. Reifman examined defendant for approximately 1½ hours. Dr. Reifman also reviewed a social history given by defendant's mother to a social worker. Therein, it was stated that defendant was one of seven children borne by his mother by seven

different fathers; that defendant's father was an alcoholic; that one of defendant's brothers spent time in a mental institution; that defendant had suffered from frequent headaches as a child; and that defendant had been struck on the head as a child, after which he seemed to "change." The social history also indicated that defendant's mother said that defendant had no history of mental illness.

Dr. Reifman also reviewed defendant's confessions to the instant crimes and to the murder of Cherry Wilson. Defendant had confessed, while in jail on the instant murder and rape charges, to stabbing Wilson to death. In confessing to the murder of Wilson, defendant stated that "something" told him to kill her and that he "got excited feeling the blood and got into sawing her throat."

Dr. Reifman found defendant to be a sadist with an antisocial personality disorder and an alcohol and drug abuser. Dr. Reifman testified that a sadist such as defendant derives sexual pleasure and self-esteem from inflicting pain on others. Dr. Reifman found that defendant experiences sadistic, sexually violent urges, but that defendant was capable of controlling those urges. The doctor concluded that defendant did not want to control these urges. Dr. Reifman related that defendant told him that he had tortured animals as a child and that his "purpose in life" is to kill.

Dr. Reifman stated that sadism is a personality disorder, but that whether it qualifies as a mental illness is a subject of debate among psychiatrists. Dr. Reifman further found that while defendant did indeed suffer from sadism, defendant was attempting to fake a mental disease. The doctor concluded that defendant was not suffering from any mental disease or defect and that he could conform his conduct to the requirements of the law and was therefore legally sane.

Prior to Dr. Reifman's examination of defendant, defendant was examined by Dr. Lisa Grossman, a psychologist working with Dr. Reifman. According to Dr. Reifman's testimony, Dr. Grossman diagnosed defendant as suffering from a mixed personality disorder, with antisocial and borderline features, and explosive episodes. Dr. Grossman however agreed with Dr. Reifman that defendant was legally sane.

Dr. Reifman testified that he was aware that in 1978, Dr. Gonzalez, a psychiatrist with Dr. Reifman's Institute, diagnosed defendant as suffering from paranoid schizophrenia with mental retardation and drug abuse. Dr. Gonzalez had examined defendant after defendant was arrested in 1977 for stabbing his sister's husband. In that incident, defendant was reported to have, while at his sister's apartment, taken a butcher knife from next to a birthday cake and, for no apparent reason, stabbed Ricky Lee. Defendant was then said to have laughed and stared into space when asked about the stabbing by his mother. Dr. Reifman disagreed with Dr. Gonzalez's diagnosis and did not believe that defendant was suffering from schizophrenia currently or in 1978.

Defendant's mother, Sinnie May Johnson, gave testimony regarding defendant's childhood and family background. Ms. Johnson described defendant's behavior following the 1977 stabbing, recounting that defendant first laughed, then just stared into space after the incident. Ms. Johnson also testified that defendant would sometimes act "as if his mind was gone" and would laugh when nothing was funny. She further stated that defendant had suffered frequent headaches as a child and that she had once taken him to the hospital because of his headaches.

The State presented the testimony of Detective Robert Shanahan in rebuttal. Detective Shanahan had investigated the 1977 stabbing incident and testified that

he had been told by defendant that his reason for stabbing Ricky Lee was that Lee had beaten defendant's sister and nephew.

Following closing arguments by both sides, the jury was instructed on, among other things, the defense of insanity and the verdict of guilty but mentally ill. The jury returned verdicts of guilty of murder and guilty of aggravated criminal sexual assault. At the eligibility phase of the death penalty hearing requested by the State, stipulations were entered that defendant had been convicted of murder and aggravated criminal sexual assault and that defendant was over 18 at the time of the offenses. The jury found that defendant had committed intentional or knowing murder in the course of a felony and therefore found him eligible for the death penalty under section 9—1(b)(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, 9—1(b)(6)). The aggravation and mitigation phase of the death penalty hearing was thereafter commenced.

The State's first witness in aggravation was Shirley Randolph, who testified that she was beaten and raped by defendant on December 5, 1985. Randolph was the sister of defendant's then-girlfriend, Donna Randolph. Randolph stated that she was at defendant and Donna's apartment waiting for her sister when defendant tore off her clothing and told her he was going to rape her. Defendant thereafter tied and gagged Randolph and repeatedly forced her to perform oral sex and repeatedly raped her vaginally. Throughout the attack, defendant beat Randolph severely, ultimately fracturing her jaw. Randolph testified that she had known defendant for 13 years and had never before seen him act in an aggressive or bizarre manner.

Assistant State's Attorney Michael Gerber also testified in aggravation. Gerber had investigated the December 5, 1985, rape of Shirley Randolph and had inter-

viewed defendant in connection with that incident. Defendant made a confession to Gerber in which he bragged about the rape and stated that he "broke the m—f—ing bitch's jaw and then I raped her."

Three aggravation witnesses gave testimony regarding defendant's confessed murder of Cherry Wilson. Detective Thomas Blomstrand testified that on May 8, 1984, he conducted an investigation into the homicide of Cherry Wilson. According to Detective Blomstrand, Wilson's naked body was found lying on a bed with slash wounds across her breast, abdomen and legs and a massive gash across her throat. Detective Michael O'Sullivan testified that he interviewed defendant on December 6, 1985, and defendant gave him information about a murder. Detective O'Sullivan checked police records and found that defendant's account was consistent with the murder of Wilson and fingerprints found on a beer bottle at the Wilson murder scene were identical to defendant's fingerprints. Assistant State's Attorney Peter Vilkelis testified that he took a written statement from defendant regarding the Wilson murder on December 6, 1985. Therein, defendant stated that he had engaged in consensual sex with Wilson after which he went to the bathroom where "something" told him to kill her. Defendant stated that he returned to the bedroom and proceeded to cut Wilson's throat and to stab her elsewhere on her body. Defendant related that he "got excited feeling the blood and got into sawing her throat." Both Vilkelis and Detective O'Sullivan testified that defendant was "matter-of-fact" when he gave them his confession.

Also testifying in aggravation was Deborah Wilson. Wilson met defendant on July 2, 1980, when she worked as a receptions and classifications counselor at Joliet Correctional Center. Defendant had been convicted of rape and Wilson was to evaluate him to determine in what correctional facility he should be placed. Wilson

testified that defendant denied ever being hospitalized for psychiatric care and admitted to only a "social" use of drugs. Wilson found defendant to be evasive and manipulative and concluded that he needed maximum security incarceration.

The State concluded its presentation of aggravation evidence with the admission of two stipulations. Those stipulations consisted of certified copies of defendant's convictions for rape in 1980 and for unlawful use of weapons in 1984.

Defendant testified on his own behalf in mitigation. Defendant recounted the circumstances surrounding his childhood and family background. Defendant stated that his mother used to beat him and his siblings with extension cords and other devices when they were children. Defendant testified that these beatings would occur when their mother believed that they had done something wrong. Defendant described one occasion on which his mother beat him with a butcher knife. Defendant admitted that he never told any of the psychiatric doctors who examined him about the beatings. Defendant also testified that his now-deceased older brother used to rape their sister when they were children. Defendant stated that, as a child, he had cut up animals and played in their blood. Defendant further stated that he began drinking alcohol at age 11 and admitted to using numerous drugs.

During his testimony, defendant confessed to the commission of several crimes. Defendant admitted that he murdered Robinson and raped C.L., that he murdered Cherry Wilson, that he raped Shirley Randolph, and that he stabbed Ricky Lee. Defendant further testified that he has three children, two by Donna Randolph and one by the woman he was convicted of raping in 1980. Defendant stated that he had received work training from Goodwill and has been employed as an assistant

cook and as a punch presser. Defendant also testified that he attended, though not regularly, two years of high school before dropping out of school altogether.

Finally, defendant testified to his remorse for the crimes he committed. Defendant stated that he did not know why he had done the things he had done and he stated that he wanted the death penalty because he took a life. However, defendant asked that his life be spared because of his children, his siblings and his mother.

The next witness to testify in mitigation was Dr. Jose M. Gonzalez, a psychiatrist. Dr. Gonzalez testified that he was employed by the Psychiatric Institute of the Circuit Court of Cook County in 1978 when he interviewed defendant after defendant had been charged with the stabbing of Ricky Lee. Dr. Gonzalez, referring to the report containing his conclusions about defendant, stated that he had found defendant to be psychotic, delusional, and a danger to himself and others, at that time. Dr. Gonzalez testified that his specific diagnosis in 1978 was that defendant suffered from paranoid schizophrenia and mental retardation. The doctor stated that schizophrenia is a mental disease. On cross-examination, Dr. Gonzalez admitted that he had not read the police reports relating to the 1977 stabbing incident prior to diagnosing defendant and that his diagnosis was based, in part, on the fact that defendant's version of the stabbing incident did not make any sense. Dr. Gonzalez emphasized that his testimony was history only and that he had no opinion on defendant's present mental condition.

Also testifying in mitigation was Thomas Hansen, a sheriff's deputy working at the psychiatric holding facility at Cook County jail. Hansen stated that he had been trained as a psychiatric officer and that defendant had been an inmate in Hansen's facility for approximately two years. Hansen related that he knew of no problems involving defendant other than one altercation in which

almost all the inmates were involved. Hansen testified that defendant tended to remain isolated, had not exhibited violence, was helpful with other inmates and generally functioned well, though he did occasionally resort back to "psychotic behavior."

Dr. Reifman was called again by defendant to testify in mitigation. Dr. Reifman stated that defendant suffered from severe emotional disturbances and a sadistic personality disorder. Dr. Reifman further stated that defendant's drug and alcohol abuse extenuates his disorders and that defendant's chaotic family life affected his personality.

The final mitigation testimony was offered by two of defendant's sisters. Both sisters corroborated defendant's testimony that he and the other siblings were beaten by their mother, that defendant suffered from severe headaches as a child, and that defendant's older brother raped one of the sisters when they were children. Both sisters asked that defendant's life be spared.

The aggravation and mitigation phase of the death penalty hearing closed with the admission of several stipulations. It was stipulated that defendant, while incarcerated in Pontiac Correctional Center in 1980, requested a psychiatric examination. It was further stipulated that on January 2, 1981, defendant was examined by Dr. Yong S. Ha and that Dr. Ha's report indicated that defendant had no history of mental illness and was cooperative and articulate. Dr. Ha's report further related defendant's statement that he used to cut up animals and defendant's statement that, while in prison, when something told him to "go off," something else told him to "keep cool and restrain himself." Dr. Ha recommended that defendant return for a follow-up examination in four weeks; however, it was stipulated that no record could be found that indicated a follow-up examination took place.

The jury returned a verdict finding no mitigating factors sufficient to preclude a sentence of death. Defendant was accordingly sentenced to death by the trial court.

I

Defendant first contends that his conviction must be reversed because the evidence established that he was legally insane. Defendant argues that, despite Dr. Reifman's opinion that he was legally sane, his behavior provides compelling evidence that the opposite conclusion is warranted. Defendant points to the testimony regarding his childhood, the 1977 stabbing incident, and Dr. Gonzalez's 1978 diagnosis, as establishing a history of mental problems. Defendant then emphasizes the bizarre nature of his actions in committing the instant crimes, particularly the repeated cutting of Robinson's presumably dead body and the fact that he let C.L. live so that she could "write the story." As further support for his argument, defendant emphasizes those portions of Dr. Reifman's opinion that found defendant to be a sadist and to be suffering from an antisocial personality disorder.

Section 6—2 of the Criminal Code of 1961 defines the defense of insanity as follows:

"§6—2. Insanity. (a) A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).)

The burden is on the defendant to prove by a preponderance of the evidence that he is legally insane. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(e).) The issue of a defendant's insanity is a question of fact, and the jury's resolution of that issue will not be overturned unless it is con-

trary to the manifest weight of the evidence. *People v. Engram* (1990), 193 Ill. App. 3d 511, 523.

We agree with the State that the evidence in the record amply supports the jury's finding that defendant failed to prove his insanity by a preponderance of the evidence. Dr. Reifman, the sole psychiatric expert to testify at trial, unequivocally stated that, in his opinion, defendant was legally sane and was attempting to fake insanity. Contrary to defendant's assertions, the evidence presented regarding defendant's history and behavior does not compel an opposite conclusion. Defendant's assertion that he had a history of mental problems is questionable. Defendant's mother stated that defendant had no history of mental illness and there is no documentation of any psychiatric treatment or hospitalization of defendant. Likewise, defendant's claims of bizarre behavior as a child, including torturing animals, were uncorroborated. As to the 1977 stabbing of Ricky Lee, the State established that defendant had a motive for the allegedly unexplained incident. Further, defendant's reported behavior following the incident, even if believed, would not be sufficient to establish his insanity in 1985, and Dr. Gonzalez's 1978 diagnosis likewise bears little relevance on defendant's mental condition at the time he committed the 1985 crimes. (See *People v. Silagy* (1984), 101 Ill. 2d 147, 169.) In addition, Dr. Gonzalez's 1978 diagnosis of schizophrenia was undermined when Dr. Reifman, who had reviewed Dr. Gonzalez's report and the circumstances of the 1977 stabbing incident, testified that he disagreed with Dr. Gonzalez's diagnosis.

Further, defendant's conduct in committing the murder and rape at issue, while admittedly heinous, does not compel a reversal of the jury's determination. The fact that a defendant's conduct can be characterized as "bizarre" or "shocking" does not compel a finding of legal insanity, particularly where there is expert testimony

supporting the opposite conclusion. (*Silagy*, 101 Ill. 2d at 169; *People v. Jackson* (1978), 57 Ill. App. 3d 809, 815.) Moreover, evidence that a defendant committed an offense in a manner designed to avoid detection and made efforts to conceal the crime or his involvement has been found to support a finding that the defendant was legally sane. (*Silagy*, 101 Ill. 2d at 169; *People v. Williams* (1990), 201 Ill. App. 3d 207, 219; *People v. Fosdick* (1988), 166 Ill. App. 3d 491, 500.) C.L.'s testimony and defendant's written statement both indicated that defendant's conduct was, at least in some respects, motive-oriented and calculated to avoid detection. Defendant's efforts to avoid detection were evidenced by defendant's statement to C.L. that "If I have to I run from state to state"; by defendant's looking out the window of the apartment to make sure that no one was watching; by defendant's returning to the apartment to retrieve his address book; and by defendant's donning of gloves for the perpetration of the crimes. Moreover, under either C.L.'s or defendant's version of the crimes, defendant had a motive of sorts for attacking Robinson. According to defendant, the attack was precipitated by Robinson's interference with defendant's punishment of C.L. According to C.L., defendant attacked Robinson because Robinson returned to the apartment after defendant had begun his attack on C.L. Further, defendant's assertion that his insanity was demonstrated by his repeatedly cutting Robinson's throat after Robinson was dead is undermined by the evidence. In defendant's written confession, defendant states that he returned to cut Robinson's throat when he heard Robinson moving. Similarly, the coroner, Dr. Kirschner, testified that each of the wounds inflicted on Robinson was inflicted while Robinson was still alive.

Defendant's reliance on Dr. Reifman's diagnosis of sadism as requiring an insanity verdict is also misplaced.

Dr. Reifman himself did not believe that this diagnosis indicated insanity. We thus fail to see how this testimony could be said to support the argument that defendant was insane. Moreover, we note that, in other cases, a diagnosis by a psychiatrist that a defendant is a "sadist" has not been found to require reversal of a determination that the defendant was sane. See *People v. Gacy* (1984), 103 Ill. 2d 1, 58; *People v. Williams* (1990), 201 Ill. App. 3d 207, 214; *People v. Gurga* (1986), 150 Ill. App. 3d 158, 163.

We thus find that the evidence amply supports the jury's finding that defendant was legally sane. The jury had the opportunity to consider all of the evidence presented on this issue, including that highlighted by defendant in this appeal, and we cannot say that the jury's finding that defendant was legally sane was manifestly erroneous. See *People v. Engram*, 193 Ill. App. 3d at 524.

## II

Defendant next contends that the evidence of his mental illness was so compelling that, if not insane, he should have been found guilty but mentally ill. Illinois law provides for the alternative verdict of guilty but mentally ill where a defendant has unsuccessfully raised the defense of insanity. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(c).) The statutory provision in effect at the relevant time provided that a defendant may be found guilty but mentally ill when the trier of fact finds beyond a reasonable doubt that the defendant is guilty of the offense charged, was mentally ill at the time of the offense, and was not legally insane at the time of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) Such a verdict does not relieve a defendant of criminal responsibility and that defendant is subject to any sentence which could have been imposed upon a defendant who had been

convicted of the same offense without a finding of mental illness, including the death penalty. (Ill. Rev. Stat. 1985, ch. 38, pars. 6—2(c), 1005—2—6(a); *People v. Crews* (1988), 122 Ill. 2d 266, 283.) However, upon a finding of guilty but mentally ill, the Department of Corrections is statutorily obligated to "cause periodic inquiry and examination to be made concerning the nature, extent, continuance, and treatment of the defendant's mental illness" and to provide "such psychiatric, psychological, or other counseling and treatment for the defendant as it determines necessary." Ill. Rev. Stat. 1985, ch. 38, par. 1005—2—6(b).

A finding of guilty, rather than guilty but mentally ill, by the trier of fact will not be reversed on appeal unless the decision is so improbable or unsatisfactory as to raise a reasonable doubt as to the defendant's mental illness at the time of the offense. (*People v. Christiansen* (1987), 116 Ill. 2d 96, 118-19.) We find that ample evidence was introduced at trial to support the jury's finding that defendant was guilty of the crimes charged.

For purposes of the guilty but mentally ill verdict, "mental illness" is defined as:

> "a substantial disorder of thought, mood, or behavior which afflicted a person at the time of the commission of the offense and which impaired that person's judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or is unable to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(d).)

Defendant contends that Dr. Reifman testified that he was "mentally ill" and that, because this testimony was "unrefuted," it was conclusively established that he was guilty but mentally ill. We observe that, while Dr. Reifman did indeed conclude that defendant was a sadist, it is unclear whether or not Dr. Reifman classified sadism as a "mental illness." Regardless, we find that whether

Dr. Reifman used the term "mental illness" to describe defendant's disorder is not dispositive. Dr. Reifman was not asked to explain his understanding of the term "mental illness" nor was he asked to give an opinion as to whether defendant suffered from a "mental illness" as the term is defined in the guilty but mentally ill statute. Dr. Reifman therefore cannot be said to have given testimony that defendant was "mentally ill" within the meaning of the statute. The issue is thus better stated as whether the evidence, including Dr. Reifman's testimony, established that defendant suffered from a substantial disorder that impaired his judgment at the time of the offenses.

In arguing that he should have been found guilty but mentally ill, defendant emphasizes many of the same aspects of the evidence as he did in arguing that he was proved insane. Generally, defendant focuses on the diagnosis that he is a sadist, his behavior as a child, the mental problems suffered by other members of his family, Dr. Gonzalez's 1978 diagnosis of schizophrenia, and his bizarre conduct in committing both the crimes on trial and past crimes. We find that this evidence is not sufficiently compelling to require the reversal of the jury's finding that defendant was guilty, rather than guilty but mentally ill. The jury's finding was supported by, among other things: the fact that no expert testified that defendant suffered from a substantial disorder that impaired his judgment at the time of the 1985 crimes; the evidence that defendant had no history of mental illness; the evidence that defendant's conduct in committing the crimes on trial was to some degree motive-oriented and calculated to avoid detection; and the fact that defendant was able to give detailed statements regarding the instant crimes and the Wilson murder. In light of the preceding, we cannot find that defendant has raised a rea-

sonable doubt as to his mental illness at the time of the offenses.

A similar argument was made by the defendant in *People v. Christiansen* (1987), 116 Ill. 2d 96. Therein, the defendant argued that the trial court erred in finding him guilty because the evidence "conclusively" established that he was guilty but mentally ill. The psychiatric expert for the defense had testified that the defendant was "grossly impaired" due to severe alcoholism and had opined that the defendant had suffered alcohol-induced blackouts at the time of the offenses and was legally insane at the time of the offenses. The State's experts both testified that the defendant was legally sane, but one of them conceded that the defendant was "mentally ill," within the meaning of the guilty but mentally ill statute, as a result of severe alcoholism. (*Christiansen*, 116 Ill. 2d at 112-14.) Despite this expert testimony, this court upheld the trial court's finding that the defendant was guilty rather than guilty but mentally ill, relying on the fact that the defendant had not appeared to be intoxicated at the time of the crimes, had been able to give detailed accounts of the crimes, and had made efforts to conceal his identity during the commission of the crimes. *Christiansen*, 116 Ill. 2d at 118.

We find the evidence in the instant case regarding defendant's mental illness to be even less compelling than that presented in *Christiansen*. Unlike *Christiansen*, defendant herein presented no expert opinion that he was insane or mentally ill as defined by the statute. Accordingly, we hold that the record reveals no evidence which raises a reasonable doubt as to defendant's mental illness at the time of the crimes on trial.

## III

Defendant raises several issues regarding the propriety of the guilty but mentally ill instructions given at

trial. The trial judge gave the following instructions to the jury regarding the verdict of guilty but mentally ill:

"A person may be found guilty but mentally ill and is not relieved of criminal responsibility for his conduct if at the time of the commission of the offense he was not insane but was mentally ill.

\* \* \*

A person is mentally ill, if at the time of the commission of the offense, he was afflicted by a substantial disorder of thought, mood or behavior which impaired his judgment, but not to the extent that he is unable to appreciate the wrongfulness of his behavior or was unable to conform his conduct to the requirements of the law.

\* \* \*

As to any charge, the defendant may be guilty but mentally ill if you find:

*First*: Beyond a reasonable doubt that the defendant has committed the offense charged; and

*Second*: By a preponderance of the evidence that the defendant was sane at the time of the commission of the offense; and

*Third*: That the defendant was mentally ill at the time of the commission of the offense.

If you find from your consideration of all the evidence that each of these propositions has been proved, you should find the defendant guilty but mentally ill.

If you find from your consideration of all the evidence that the first proposition has not been proved, you should find the defendant not guilty.

If you find from your consideration of all the evidence that the first proposition has been proved but the defendant has proven by a preponderance of the evidence that he was insane at the time of the commission of the offense, you should find the defendant not guilty by reason of insanity.

If you find from your consideration of the evidence that the first and second propositions have been proved, but that the third proposition has not been proved, you should find the defendant guilty."

Initially, defendant contends that the giving of the above instructions was error because the instructions' allocation of the burdens of proof conflicts with the language of the guilty but mentally ill statute. The statutory provision authorizing the guilty but mentally ill verdict in effect at the relevant time provided that a defendant may be found guilty but mentally ill when the *State* proves *beyond a reasonable doubt* each of the following: (1) that the defendant committed the offense; (2) that the defendant was not insane; and (3) that the defendant was mentally ill. (Ill. Rev. Stat. 1985, ch. 38, par. 115—4(j).) The guilty but mentally ill instructions given in the instant case required that defendant be found to have committed the charged offenses beyond a reasonable doubt. However, the instructions then required that defendant be found to be sane by only a preponderence of the evidence and required that defendant be found to be mentally ill without specifying the standard of proof for that element. The instructions also failed to specify that the State bore the burden of proof on each of the three elements.

This court held in *People v. Fierer* (1988), 124 Ill. 2d 176, 186, that a guilty but mentally ill instruction which required that the defendant be found to be sane *by a preponderance of the evidence* was in conflict with the clear and unequivocal language of the statute which required the State to prove the defendant's sanity *beyond a reasonable doubt.* The *Fierer* court held this conflict to be reversible error. (*Fierer,* 124 Ill. 2d at 186.) Here, as in *Fierer,* the guilty but mentally ill instructions conflicted with the statute by requiring that defendant be found to be sane by a preponderance of the evidence rather than requiring proof of defendant's sanity beyond a reasonable doubt. In keeping with our decision in *Fierer,* we find that the giving of those instructions was

error. However, the State urges us to conclude that the error was harmless and we are inclined to agree.

An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different if the proper instruction had been given. (*Fierer*, 124 Ill. 2d at 187.) In *Fierer*, the argument that the error was harmless was rejected because the court found that the incorrect instruction might have altered the outcome of the trial. (*Fierer*, 124 Ill. 2d at 187-88.) In *Fierer*, the defendant had pled insanity and was ultimately found to be guilty but mentally ill. In rejecting a finding of harmlessness, this court stated:

> "The modification of the burden of proof from 'not insane beyond a reasonable doubt' to 'sane by a preponderance of the evidence' had the undeniable effect of making the [guilty but mentally ill] verdict easier to attain and more likely to result. If the jury, properly instructed, had been unable to conclude that the defendant was sane beyond a reasonable doubt, it would have faced a more difficult choice between not guilty or guilty." (*Fierer*, 124 Ill. 2d at 187.)

We thus found that the incorrect instruction made a guilty but mentally ill verdict easier to reach than it would have been under a proper instruction. We concluded that, because the jury did in fact reach a verdict of guilty but mentally ill, the error could have contributed to the jury's returning a verdict which it would not have reached had it been properly instructed. *Fierer*, 124 Ill. 2d at 187.

Defendant argues that the error was not harmless in the instant case because he would have been found guilty but mentally ill, rather than guilty, had the jury been properly instructed. However, it is clear that, had the jury been properly instructed, a guilty but mentally ill verdict would have been *less* likely to result. The erroneous instruction required that defendant's sanity be

proved *by a preponderance of the evidence* for a guilty but mentally ill verdict to be reached. An instruction which complied with the statute would have required that defendant's sanity be proved *beyond a reasonable doubt* for a guilty but mentally ill verdict to be reached. The erroneous instruction thus made a guilty but mentally ill verdict *easier* to reach than a proper instruction would have, yet the jury declined to reach that verdict. We are hard-pressed to conceive of how the proper instruction, which would have made a guilty but mentally ill verdict *harder* to attain, could have resulted in a guilty but mentally ill verdict. We thus find that, because the jury found defendant guilty rather than guilty but mentally ill despite an erroneous instruction making the latter verdict easier to attain, the erroneous instruction could not have affected the outcome of the trial. The *Fierer* error in the instant case was thus harmless. See *People v. Williams* (1990), 201 Ill. App. 3d 207, 222.

As defendant's next challenge to the guilty but mentally ill instructions he asserts that the instructions caused him to be found guilty rather than guilty but mentally ill because he fell into the "gap" between the defendant's burden of proof under the insanity statute and the State's burden of proof under the guilty but mentally ill statute. In *Fierer*, we noted that the guilty but mentally ill statute's allocation of the burdens of proof resulted in an anomalous situation when juxtaposed with the burden of proof under the insanity statute. Under the insanity statute, the defendant had the burden of proving *by a preponderance of the evidence* that he was *insane* while, under the guilty but mentally ill statute, the State had the burden of proving *beyond a reasonable doubt* that the defendant was *not insane*. As we stated, "[u]nder this scheme, a theoretical class of defendants exists who cannot be found insane and thus not guilty by reason of insanity, because they have not

carried their preponderance burden, but who also may not be found [guilty but mentally ill] because their noninsanity has not been proved by the State beyond a reasonable doubt." (*Fierer*, 124 Ill. 2d at 189.) Whatever the effect of this incongruity, it is evident that it played no part in the instant case because, as noted, the guilty but mentally ill instructions given herein did not comply with the statute. The guilty but mentally ill instructions stated that defendant must be found sane by a preponderance of the evidence rather than sane beyond a reasonable doubt, as the statute required. The insanity instructions given properly stated that defendant must prove his insanity by a preponderance of the evidence. The gap between the burdens of proof noted in *Fierer* was thus eliminated. Defendant's argument on this point is without merit. Defendant argues that the instructions given still resulted in a "gap" between the State's burden, under the guilty but mentally ill instructions, of proving sanity by a preponderance and defendant's burden, under the insanity instructions, of proving insanity by a preponderance. We fail to see any gap between those two burdens and we find that this argument is also without merit.

Defendant next contends that the guilty but mentally ill instructions were erroneous because, while the *statute* required the State to prove defendant's mental illness, the *instructions*, while including that element, did not indicate which party bore the burden of proof on that element. Defendant is correct in his assertion that the guilty but mentally ill statute placed the burden on the State to prove mental illness. The instructions' failure to allocate that burden to the State was thus in error. However, any such error was harmless beyond a reasonable doubt. Had the burden of proving defendant's mental illness been allocated to the State as the statute required, a verdict of guilty but mentally ill would have been more

difficult to attain. At trial, the State's objective was to present evidence to refute defendant's claim of insanity. Thus, the likelihood that the State would have been motivated to present evidence that defendant was mentally ill is virtually nil. A guilty but mentally ill instruction placing the burden on the State to prove defendant's mental illness would therefore have rendered a guilty but mentally ill verdict almost impossible to reach. As the jury rejected a guilty but mentally ill verdict under an erroneous instruction making it easier to attain, we find that this error in the instruction could not have affected the outcome of the trial.

Defendant's last challenge to the guilty but mentally ill instructions goes to an alleged infirmity in the guilty but mentally ill statute. Defendant argues that the statute is faulty in that it places the burden on the State to prove defendant's mental illness beyond a reasonable doubt, a burden which the State will not likely be motivated to fulfill. Defendant analogizes to this court's decision in *People v. Reddick* (1988), 123 Ill. 2d 184, 194, where error was found in murder and voluntary manslaughter instructions which placed the burden on the State to prove the mitigating factors necessary to reduce murder to voluntary manslaughter. In *Reddick*, this court held that these instructions resulted in grave error because they required the *State* to prove the mitigating factors, a burden the State, in seeking a murder conviction, would have no reason to fulfill. (*Reddick*, 123 Ill. 2d at 194.) Defendant contends that the guilty but mentally ill statute contained an analogous error in that it placed a burden on the State to prove an element helpful to the defendant.

We find that whether the guilty but mentally ill statute's burden allocation is infirm is not an issue properly presented by this case because the instructions given herein did not comply with that statute. The guilty but

mentally ill instructions in the instant case did *not* indicate that the State had the burden of proving defendant's mental illness; rather, they failed to allocate that burden to either party. The instructions thus eliminated any *Reddick*-type error potentially posed by the statute. We note in passing that the guilty but mentally ill statute has since been amended to provide that the defendant bears the burden of proving his mental illness by a preponderance of the evidence and to require that defendant be found to have failed to prove his insanity by a preponderence of the evidence. Pub. Act 86—392, eff. Jan. 1, 1990.

## IV

Defendant next argues that error occurred when Dr. Reifman testified to an incorrect definition of legal insanity. During the State's cross-examination of Dr. Reifman, the doctor was asked to explain to the jury the legal definition of insanity. Dr. Reifman testified that legal insanity is defined as:

> "A person who has a mental disease or defect, that is defined in the law as somebody who is *grossly out of contact with reality, who misperceives reality, and who acts upon that misperception of reality,* and his loss of contact with reality *cannot be associated with the voluntary ingestion of any kind of drugs*; a person who has a mental disease, given that definition or mental defect with brain damage or severe loss of brain tissue, mental retardation who cannot appreciate the criminality of his act or conform his conduct with the requirements of the law is legally insane." (Emphasis added.)

Defendant contends that the legal definition of insanity contains no requirement that the defendant be "out of contact with reality" nor does it provide that the voluntary ingestion of drugs negates the possibility of legal insanity.

We note that, while defendant objected to the doctor's being permitted to testify to a legal definition, he made no objection to this definition as being incorrect. Nor did defendant raise this allegation of error in his written post-trial motion. The issue has thus been waived. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Even if we were to consider the issue, we would find no reversible error to have been committed. While it is true that Dr. Reifman misstated the definition when he referred to a lack of contact with reality, this single, isolated misstatement cannot be found to have tainted the jury's deliberations. Dr. Reifman repeatedly testified in terms relating to the correct definition of insanity. Moreover, the jurors were repeatedly instructed that they must follow the law as the *judge* gave it to them and they were thereafter instructed by the judge as to the correct definition of insanity. In *People v. Gacy* (1984), 103 Ill. 2d 1, 87, this court held that the prosecutor's misstatement of the test for insanity during closing argument did not mislead the jury in that it was a single remark among repeated statements of the proper test. We likewise find that Dr. Reifman's misstatement did not constitute reversible error.

## V

Defendant's next assignment of error is addressed to comments made by the prosecutor during the State's rebuttal closing argument at trial. Defendant argues that the prosecutor misstated both the facts and the law when he made the following argument:

"Ladies and Gentlemen, to the defendant, insanity is like a train. You or I would catch to go to work. He catches that train whenever he needs it. 1978 he got on.

[DEFENSE COUNSEL]: Objection, your Honor. He never pled insanity in '78.

THE COURT: The jury heard the evidence.

[DEFENSE COUNSEL]: It don't—

THE COURT: Counsel, the jury heard the evidence. Proceed.

[DEFENSE COUNSEL]: He is misstating the evidence, your Honor.

[PROSECUTOR]: What did he do?

[DEFENSE COUNSEL]: He never went to trial.

[PROSECUTOR]: What did he do in 1978 on the train, Ladies and Gentlemen? He got off. He got off the train. Now he got in trouble again in 1985 and low [sic] and behold here comes the insanity express right off the track. So this is where I get on, Ladies and Gentlemen. Gets on the train.

He is riding the train now tooting the whistle and sounding the horn. And if you want to sign a verdict that he is insane or mentally' ill the train pulls into the next station. And you know who gets off."

Defendant first argues that the above-quoted comments by the prosecutor misstated the facts in that they implied that defendant had been found not guilty by reason of insanity in 1978 when there was no evidence to support that contention. We note that no evidence was presented at trial as to whether defendant was ever tried for the 1977 stabbing of Ricky Lee or, if he was in fact tried, as to what the ultimate disposition of the case was. However, we do not believe that the referred-to comments implied that defendant had pled insanity and been acquitted on that ground in 1978. In presenting a closing argument, the prosecutor is allowed a great deal of latitude and is entitled to argue all reasonable inferences from the evidence. (*People v. Owens* (1984), 102 Ill. 2d 88, 105.) The prosecutor herein argued in closing that defendant was attempting to fake a mental disease and that he had done so in the past. The train analogy served to illustrate the prosecutor's contention that defendant could feign insanity when it was necessary and cease feigning when it became unnecessary. Such an

argument was fairly inferable from the testimony of Dr. Reifman regarding defendant's attempts to fake a mental disease. We find that this argument did not misstate the facts of this case. See *People v. Free* (1983), 94 Ill. 2d 378, 419 (prosecutor's argument that the defendant's insanity defense was a fabrication was a proper comment on the evidence).

Defendant also contends that the "insanity train" analogy constituted a misstatement of the law in that it told the jury that defendant would "get off" if it found him insane. Defendant argues that the reference to "gets off" implied that defendant would be automatically freed if found not guilty by reason of insanity. However, we find that this was not the implication of the prosecutor's comments. We think it clear that "gets off" referred to defendant's avoiding criminal responsibility for the crimes. Under Illinois law, a defendant found not guilty by reason of insanity is held to be not criminally responsible for the charged offense. (Ill. Rev. Stat. 1985, ch. 38, par. 6—2(a).) Thus, the prosecutor's argument that a verdict of insanity would result in defendant's not being held criminally responsible was an accurate statement of the law. *Cf. United States ex rel. Alerte v. Lane* (N.D. Ill. 1989), 725 F. Supp. 936, 942 (prosecutor misstated the law in saying that an insanity verdict would allow the defendant to " 'skate,' 'walk out ... and scoff' " and would "cut him loose").

## VI

Defendant next argues that his death sentence is excessive in light of the evidence presented in mitigation. Specifically, defendant contends that the evidence that he is mentally retarded, a victim of child abuse, an alcohol and drug abuser, and mentally ill was sufficient mitigation to preclude a sentence of death.

The decision at the aggravation-mitigation phase of a capital sentencing hearing is a balancing process in which aggravating evidence is weighed against mitigating evidence. (*People v. Gacy* (1984), 103 Ill. 2d 1, 101.) A capital sentencing jury's decision will not be lightly overturned, particularly where it is amply supported by the record. (*People v. Brownell* (1980), 79 Ill. 2d 508, 540.) We find that, in light of the overwhelming evidence presented in aggravation, we cannot say that the jury was required to find that the mitigation evidence precluded imposition of the death penalty. In addition to the truly heinous mutilation murder of Robinson and the equally heinous acts which were perpetrated upon C.L., the State presented evidence that defendant had committed a second stabbing murder and a second brutal rape, the commission of which he later bragged about to police. While the pieces of evidence defendant points to do qualify as factors to be considered in mitigation under the criminal code and case law, there is no indication that the jury did not consider those factors and weigh them against the evidence presented in aggravation. The jury's decision that the mitigation evidence did not outweigh the aggravation evidence is amply supported by the record. We decline to disturb that determination. See *People v. Christiansen* (1987), 116 Ill. 2d 96, 129 (death penalty appropriate despite mitigating evidence which included emotional and mental disturbance, alcoholism, drug addiction, poor health, deprived childhood and remorse); *People v. Montgomery* (1986), 112 Ill. 2d 517, 533 (death penalty appropriate where mitigating evidence consisted of a troubled youth, an alcoholic mother, an abusive and drug-addicted father, heavy drinking, an antisocial personality disorder, and an extreme mental or emotional disturbance, and aggravating evidence consisted of heinous nature of the crime and a history of criminal and antisocial behavior).

## VII

Defendant also contends that the prosecutor improperly argued to the sentencing jury that the trial court, and not the jury, had the responsibility for imposing the death penalty in violation of the United States Supreme Court's holding in *Caldwell v. Mississippi* (1985), 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633. During the State's rebuttal closing at the aggravation-mitigation phase, the prosecutor made the following comment:

"Look at the verdict forms, Ladies and Gentlemen, and you will see what they tell you. You are to determine if there are sufficient mitigating factors to preclude the imposition of the death penalty. It says *the court, His Honor, Judge Bailey, shall sentence the defendant. You don't sentence him.* You look and see if there are sufficient mitigating factors." (Emphasis added.)

In *Caldwell*, the prosecutor in a capital case had argued to the sentencing jury that their decision to impose death would not be a final decision because it was automatically reviewable by the State supreme court. A defense objection to the prosecutor's statements was not only overruled, but the trial judge went on to express his agreement with the prosecutor's statements. The Supreme Court vacated the death sentence, holding that it was violative of the eighth amendment to "rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *Caldwell*, 472 U.S. at 328-29, 86 L. Ed. 2d at 239, 105 S. Ct. at 2639.

The State points out that defendant herein failed to object to the complained-of comment and to raise the issue in his written post-trial motion. It is clear that such a failure results in a waiver of the issue for review. (*People v. Enoch* (1988), 122 Ill. 2d 176, 187.) However, be-

cause this issue concerns the fairness of a capital sentencing hearing, we will review the propriety of the prosecutor's statements. See *People v. Fields* (1990), 135 Ill. 2d 18, 56.

We conclude that the statements at issue were improper under *Caldwell* in that they misstated the jury's role by saying that "you [the jury] don't sentence him." Under section 9—1(g) of the Criminal Code of 1961, when a capital sentencing jury returns a sentence of death, the trial court is *required* to follow the decision of the jury and impose a death sentence. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g).) The sole responsibility for imposing the death penalty thus rests upon the jury and any implication that the responsibility is shared by, or delegated to, the trial court is improper. *Fields*, 135 Ill. 2d at 57.

Despite the impropriety of the comments, we do not believe that they require reversal of defendant's sentence. When viewed in the context of the entire sentencing hearing, we cannot say that the comments misled the jury or diminished its sense of responsibility in determining the appropriateness of defendant's death sentence. The prosecutor went on to argue to the jury that it was facing a "heavy burden" in making this decision, the court instructed the jury that it "shall" sentence the defendant to death if the jury unanimously finds no sufficient mitigation, and the verdict form, around which the improper comments were centered, correctly informed the jury as to who bore the responsibility for imposing death. (See *People v. Perez* (1985), 108 Ill. 2d 70, 91; *Fields*, 135 Ill. 2d at 57.) We are aware that the Supreme Court in *Caldwell* rejected a "harmless error" argument. However, that rejection was based upon the fact that the trial judge therein had stated in front of the jury that the remarks were proper and upon the fact that the remarks were so prejudicial that they threat-

ened the fundamental fairness of the sentencing proceeding. (*Caldwell*, 472 U.S. at 339-40, 86 L. Ed. 2d at 246, 105 S. Ct. at 2645.) The same cannot be said in regard to the comments in the case before us. We conclude that the prosecutor's comments did not constitute reversible error.

## VIII

Defendant next charges that the prosecutor improperly suggested to the sentencing jury that, if the death penalty was not imposed, defendant would kill again. The prosecutor made the following comment during his closing at the aggravation-mitigation phase of the death penalty hearing:

"He should be held responsible for his crime. Don't let this man walk away without the death sentence because in that case what you are doing is giving him the opportunity to write the sequel to King Leo."

We agree with defendant that the reference to the "sequel to King Leo" obviously referred to defendant's committing a future murder. We also concur in the statement of law that a prosecutor may not speculate before a sentencing jury, in the absence of supporting evidence, that a defendant may commit future crimes if he is not sentenced to death. (See *People v. Hayes* (1990), 139 Ill. 2d 89, 156-57; *People v. Holman* (1984), 103 Ill. 2d 133, 163.) However, in the instant case, it is apparent that the prosecutor's comment was based upon the evidence. Dr. Reifman testified that defendant told him that his "purpose in life" was to kill and that, should he be released, he would kill again. In *People v. Gacy* (1984), 103 Ill. 2d 1, 97, this court found that the prosecutor's comment to the sentencing jury that the defendant would "murder and murder and murder again and again, if you allow him to do so," to have been supported by the evidence that the defendant had committed 33 murders and

by the evidence that the defendant's previous incarceration had failed to deter him from committing further crimes. We likewise find that the prosecutor's statement herein was supported by the evidence and was therefore proper. *People v. Holman* (1984), 103 Ill. 2d 133, cited by defendant, is inapposite. In *Holman*, the prosecutor's comments were unsupported by the evidence, were repeated numerous times, and culminated in the bald assertion that, by not imposing the death penalty, the jury would be "virtually guaranteeing" that "future innocent victims will be slaughtered." *Holman*, 103 Ill. 2d at 164.

## IX

Defendant also contends that he was deprived of a fair sentencing hearing by the prosecution's reprisal of the "insanity train" analogy. During the State's rebuttal closing at the aggravation-mitigation phase, the prosecutor made the following argument:

"As the defense went through all of this evidence about insanity and mental illness I thought I heard somebody in the back of the courtroom yell out, 'Horse manure.' Because that is what it is. It is what it was before and that is what it is now. He gets insane when he needs it.

We ought to be hearing a whistle blow now and somebody yelling all aboard because he wants to get back on that train."

As the prosecutor did not in this instance refer to defendant's "getting off" as a result of an insanity defense, defendant's argument on this issue is limited to the assertion that the comment misstated the facts of the case by implying that defendant had previously been acquitted by reason of insanity. As with the "insanity train" analogy made at trial, we find that this argument implied no more than that defendant was currently attempting to feign insanity and had done so in the past.

We thus find no error to have been committed. See *People v. Free* (1983), 94 Ill. 2d 378, 419.

## X

Defendant next charges that error was committed by the trial judge in his *ex parte* handling of a note sent out by the jury during its deliberations in the aggravation-mitigation phase. While the sentencing jury was deliberating it sent out a note to the trial judge apparently requesting more information. The trial judge responded to the note without informing or consulting defense counsel or the prosecuting attorney. The note itself was destroyed by the jury so its specific contents cannot be ascertained. However, after the jury had returned its verdict, the judge indicated for the record that the jury had sent out a note requesting a psychiatric diagnostic manual commonly known as the DSM—III—R and any reports by Dr. Reifman. The judge stated that he sent a response which informed the jury that it had all the information it was going to get. The judge explained that the reason he did not inform counsel for either side was that the requested information was not available.

It is axiomatic that the privacy of jury deliberations should be zealously protected against invasions and that communications from judge to jury should be made in open court and in the presence of the parties. (*People v. Tilley* (1952), 411 Ill. 473, 478; *People v. Brothers* (1932), 347 Ill. 530, 546.) The trial judge's conduct in the instant case in failing to inform the parties about the jury's request was highly improper. (See *Tilley*, 411 Ill. at 478.) However, while we do not condone such practices, we find that the communication herein does not require a reversal of the jury's verdict. An *ex parte* communication to the jury, either by the court or by a third person, does not always require setting aside the verdict where it is apparent that no prejudice resulted. (*People v.*

*Steidl* (1991), 142 Ill. 2d 204, 231; *People v. Walker* (1982), 91 Ill. 2d 502, 516.) In the case at bar, the jury's note apparently requested the DSM—III—R and any reports by Dr. Reifman. The record reveals that these documents had not been admitted into evidence and the trial judge was therefore without discretion to provide them to the jury. (See *People v. Autman* (1974), 58 Ill. 2d 171, 176.) Thus, it is clear that no prejudice to defendant could have resulted from the *ex parte* communication and reversal of the jury's verdict is not required.

## XI

Defendant next argues that the trial court improperly limited his direct examination of a mitigation witness. Defendant contends that he should have been allowed to elicit from Thomas Hansen, a guard in the psychiatric holding facility at Cook County jail, an opinion regarding defendant's future ability to function in prison should he be given a sentence of life imprisonment. The State objected to that testimony on the grounds of reliability and the trial court sustained that objection.

Defendant contends that the trial court's conduct violated the holding of *Skipper v. South Carolina* (1986), 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669. In *Skipper*, the Supreme Court held that it was reversible error for the trial court to preclude the defendant from presenting, at his death penalty hearing, the testimony of two jailers and a "regular visitor" that the defendant had "made a good adjustment" to jail. (Emphasis omitted.) (*Skipper*, 476 U.S. at 6, 90 L. Ed. 2d at 8, 106 S. Ct. at 1672.) The Supreme Court recognized that such evidence of *past* behavior in jail was probative of the defendant's probable future conduct if sentenced to life imprisonment and was thus relevant mitigation evidence. *Skipper*, 476 U.S. at 5, 90 L. Ed. 2d at 7, 106 S. Ct. at 1671.

The trial judge's ruling in the instant case was not contrary to the holding of *Skipper*. Hansen was allowed to testify regarding defendant's *past* behavior as a prisoner and was only precluded from giving opinion testimony regarding future events. The Court in *Skipper* emphasized that the defendant therein was not offering opinion testimony regarding his prospects for future adjustment to prison life, but rather was only offering testimony regarding his past behavior, from which a favorable inference about his future behavior could be drawn. (*Skipper*, 476 U.S. at 6, 90 L. Ed. 2d at 7, 106 S. Ct. at 1672.) The holding in *Skipper* is thus of no aid to defendant.

The trial judge's exclusion of Hansen's future opinion testimony does not require reversal. The standard for judging the admissibility of evidence at the aggravation-mitigation phase of a death penalty hearing is whether the evidence is relevant and reliable. (*People v. Stewart* (1984), 105 Ill. 2d 22, 67; *People v. Free* (1983), 94 Ill. 2d 378, 426.) This determination lies within the sound discretion of the trial judge and his decision will not be overturned absent an abuse of that discretion. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 364-65.) The trial judge determined that Hansen's opinion regarding defendant's future behavior was too speculative and unreliable to be admitted. While we might decide the question differently given the relatively low standard governing admissibility at this stage, we cannot say that the trial judge abused his discretion in making this determination. See, *e.g., People v. Thompkins* (1988), 121 Ill. 2d 401, 454-55 (no abuse of discretion in refusal of trial court to consider, in mitigation, 55 letters from friends and relatives of the defendant attesting to his good character); *People v. Stewart* (1984), 105 Ill. 2d 22, 67 (no error in refusal to admit opinions of the defendant's friends and family that the defendant should not be put to death).

## XII

Defendant's remaining issues challenge the constitutionality of the Illinois death penalty statute and the procedures and jury instructions employed thereunder. Each of defendant's arguments has been previously considered and rejected by this court. First, defendant contends that constitutional error was committed when the State was allowed to make both an opening closing and a rebuttal closing at the aggravation-mitigation phase. We have previously found no constitutional infirmity in this procedure because the State, as the party seeking the death penalty, bears the primary burden at this stage of proving that there are no mitigating factors sufficient to preclude imposition of the death penalty. *People v. Ramirez* (1983), 98 Ill. 2d 439, 468; *People v. Williams* (1983), 97 Ill. 2d 252, 302.

Defendant next asserts that the death penalty statute is unconstitutional because it places the burden on the defendant at the aggravation-mitigation phase to come forward with evidence of mitigating factors sufficient to preclude a sentence of death. Defendant also contends that the jury instructions which contained that same requirement were unconstitutional. In *People v. Bean* (1990), 137 Ill. 2d 65, 139, this court held that placing this burden on the defendant is constitutional because, at this point, the State has already proven beyond a reasonable doubt that a statutory aggravating factor exists and the jury is now weighing the factors in aggravation and mitigation. (See also *People v. Henderson* (1990), 142 Ill. 2d 258, 346.) We also noted in *Bean* that the defendant does not bear the sole burden at this stage, but rather, the State, as the party seeking the death penalty, bears the primary burden at this stage of persuading the jury that there are no mitigating factors sufficient to preclude a death sentence. (*Bean*, 137 Ill. 2d at 139.) Thus,

neither the statute nor the instructions are unconstitutional on this ground. See also *People v. Pitsonbarger* (1990), 142 Ill. 2d 353, 409.

Finally, defendant argues that the death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. This same argument has been repeatedly considered and rejected by this court. (*People v. Whitehead* (1987), 116 Ill. 2d 425, 465; *People v. Albanese* (1984), 104 Ill. 2d 504, 542.) Defendant has presented no compelling argument as to why we should reconsider our previous holdings.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and death sentence. We direct the clerk of this court to enter an order setting Tuesday, March 10, 1992, as the date on which the sentence of death entered by the circuit court of Cook County shall be carried out in the manner provided by law. (Ill. Rev. Stat. 1985, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

*Judgment affirmed.*