THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LILLIE ENGRAM, Defendant-Appellant.

Second District   No. 2—89—0011

Opinion filed January 22, 1990.

512

Donna R. Henderson, of Henderson & Henderson, of Waukegan, for appellant.

514

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Mary Beth Burns, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Following a jury trial, defendant, Lillie Engram, was convicted of attempted first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 8—4, 9—1(a)(1)) and sentenced to six years' imprisonment. On appeal, defendant contends that she did not receive a fair trial because (1) *voir dire* questions concerning the guilty but mentally ill (GBMI) verdict violated Supreme Court Rule 431 (107 Ill. 2d R. 431) and the State's later withdrawal of the GBMI instructions and verdict form confused the jury; (2) the court failed to provide the GBMI verdict form and instructions; (3) she was denied the right to open and close final arguments; and (4) improper comments by the prosecution prejudiced her case. She also contends that the jury's finding that she was not insane at the time of the offense is against the manifest weight of the evidence and the Illinois scheme for dealing with defendants with mental problems is unconstitutional.

At trial, defendant's husband, Willie Engram, testified that just after midnight on October 26, 1987, his wife shot him. He was lying in bed when he heard the cylinder of a gun revolving. He turned his head and heard the gunshot. He was shot in the right forehead; the bullet exited his head and went into his pillow. After the gun went off, he jumped up, grabbed defendant's hand and started yelling. The gun went off again; the second bullet struck the wall. Engram testified that his wife owned a .32-caliber gun and it was customarily kept in their house.

On cross-examination, Engram testified that on the day of the incident he had had no argument with his wife, she made no threats, and there was no indication of a problem. They conversed about their activities and planned a shopping trip for the next day. Engram observed that during the struggle for the gun defendant had a blank stare and looked across at the wall, not at Engram. After the second shot, defendant let go of the gun and walked out of the room without saying anything. Defendant went into the other bedroom and sat on the side of the bed with a blank stare. Engram testified that defendant had had psychiatric problems beginning in 1975. She had been hospitalized in 1979 and 1981 and three times during 1987. She had been released from the psychiatric ward of St. Therese's Hospital two days before the incident. Prior to this hospitalization, defendant had

never been violent toward anyone. Engram testified that defendant had talked of hearing voices since the mid-1970's and that during 1987 she would often get into depressed states. Defendant had complained that people were trying to harm her and that she had been under voodoo spells. Dr. Barrionuevo had been defendant's treating psychiatrist since 1976. Engram felt that at the time of the shooting defendant "didn't know what she was doing or what had happened."

On redirect, Engram testified that on the day of the incident defendant fed, washed and dressed herself and carried on and understood normal conversations. She lay down most of the day because she was not feeling well because of her medication; otherwise, she acted normally.

Fernando Shipley, a Waukegan police officer, testified that he interviewed defendant at approximately 8:30 a.m. on the morning of the incident. He gave her the *Miranda* warnings, and she indicated that she understood her rights and signed a rights waiver form. Shipley took a statement from defendant and asked her to write out a handwritten statement of her account of the shooting incident. The officer's typed summary of the conversation and defendant's handwritten statement were offered into evidence.

Technical evidence concerning the recovery of evidence and ballistics tests was offered, and the State rested.

Maisie Davis, defendant's mother, testified that she was called to the Engram home after the shooting and that she got there before the police arrived. She saw Lillie standing in the bedroom doorway just staring. Defendant would not respond to Davis' questions. Davis testified that at the time of trial defendant was living with her and taking three kinds of medication.

Dr. Leo Goldman, a psychiatrist, testified in defendant's behalf. Dr. Goldman testified that he examined defendant on January 13 and 18, 1988. Each session was approximately one hour long. On one of these occasions he also spoke with defendant's mother. He also reviewed defendant's hospital records from 1977 through 1988, the police reports, and defendant's voluntary statement to the police. Dr. Goldman testified that defendant's medical records indicated that her mental illness probably started several years before her first hospitalization. She had experienced various delusions; the original delusion was that a neighbor had cast a voodoo spell on her and was trying to take her husband. Defendant heard voices that belittled her and called her names. She had become distraught and called the police on some occasions. The police told defendant's husband to try to control her because she was irrational. She was hospitalized in confused and agi-

tated states. She also had a delusion that some people had put a knife to her throat at a theater and made her drink poison; when she went to the emergency room to have her stomach pumped, the people that had attacked her would not let her in and chased her away. Defendant has had periods of remission. There have been many times when she was "noncompliant with medication," which might explain a recurrence of psychotic thinking. However, even during times when defendant had been taking medication, there had been recurrences of delusions and hallucinations. The hallucinations have changed over time to where she believed that family members had beaten her and were calling her names and conspiring to kill her. She believed that her husband was under a voodoo spell that made him mean. Her husband would not give her money to get the voodoo spell removed. She had consulted a witch doctor to have the voodoo spell removed.

Dr. Goldman diagnosed defendant as having schizophrenia, paranoid type. He defined this condition as a mental disorder or disease with disorganization of thinking, delusions, hallucinations and "flattening" of emotional response. He based this diagnosis on the defendant's age at the onset of her problems, the length of time of her disorganized thinking and emotional blunting, and the history of treatment with neuroleptics (antipsychotic drugs) to control delusions and hallucinations. It was his opinion that defendant was insane at the time of the shooting. He based that opinion on the fact that the act "seemed quite irrational" and that over the years there had been severe disorganizations of her thought and an "inability to conduct her behavior in a way that would be appropriate." Her inappropriate behavior was based on hallucinations, delusions and inability to "recognize cause and effect," use "appropriate judgment" and understand the consequences of her behavior. Also, there was a marked separation of the act from the emotions and from logical thinking. He did believe, however, that defendant knew she was shooting her husband.

On cross-examination, he admitted that nothing in the record indicated that defendant was hallucinating on the day of the incident. Defendant denied motivation for the shooting. Dr. Goldman said it was a sudden impulsive behavior. He admitted that defendant intended to kill her husband and also intended to kill herself. He further admitted that his diagnosis was not based on the events surrounding the shooting.

Dr. Werner Tuteur, a psychiatrist, testified for the State. He examined defendant in March 1988. He had a 1½-hour session with defendant and a 20-minute talk with defendant's mother. During the interview, he felt that defendant was in full contact, that is, she knew

where she was and who Dr. Tuteur was, and she answered questions willingly. Defendant denied hearing voices for the last two years. She did not display paranoid ideas. Defendant told Dr. Tuteur that she was jealous of her husband. She thought he was going with other women, and "she did not want that." She denied that voodoo had anything to do with the shooting incident. She said that she had planned to kill her husband and to commit suicide. Dr. Tuteur felt that defendant was not insane at the time of the offense because she had "no mental disease which would have substantially incapacitated her to recognize the criminality of her act and to live up to the requirements of law." Defendant was not acting under a delusion; she had intent and knowledge of what she had done.

On cross-examination, Dr. Tuteur testified that before he examined defendant he had reviewed Dr. Goldman's report, the police report, and defendant's voluntary statement. He did not review defendant's hospital records until the day of trial. Defendant told Dr. Tuteur that she had been hospitalized many times, but she did not know the number of her hospitalizations, and she did not know what medication she was taking. She said that she had been hospitalized for "voices" that called her "bad names." Dr. Tuteur testified that defendant was not able to describe symptoms in general, and, "for practical purposes," this meant to him that there were no symptoms in the past. He said it was possible, however, that this inability to provide information was a sign of mental disease. He also felt the defendant's size, 260 pounds, impedes her mental functions in general. Defendant was not spontaneous in conversation but did answer questions.

Dr. Tuteur said he chose to believe defendant when she denied a connection between the voodoo spells and the shooting. He felt that defendant was not preoccupied with voodooism. In his opinion defendant never had delusions about being under a voodoo spell. A delusion is a fixed false idea. When asked whether hospital records showing that voodoo delusions dated back to 1977 would change his mind, he said no. He said a schizophrenic with delusions about voodoo and paranoia, even while in remission, would not deny preoccupation with the voodooism. He stated that when he reviewed defendant's hospital record he focused on the diagnoses, with which he disagreed. He did not review the history of symptoms upon which these diagnoses were based. He testified that even if the record showed defendant had complained of voodoo spells and voices going back to 1977, that would not change his mind concerning whether defendant was schizophrenic. He testified that someone with a long history of schizophrenia would be much worse in spite of treatment; however, defendant had improved.

Dr. Tuteur admitted that there are discrepancies between what defendant wrote in her voluntary statement to police and what she told him during the interview. He testified that defendant had decided to act on the day of the incident because her feelings of jealousy had reached a climax and she wanted to do something about it. She was unhappy; she wanted to die. Defendant told Dr. Tuteur she had been thinking about the shooting for several days before she did it.

On redirect, Dr. Tuteur testified that the last diagnosis in the hospital records is paranoid disorder and that diagnosis was made just two days before the shooting incident. Paranoid disorder is a much more harmless disorder than schizophrenia.

Officer Shipley testified again in rebuttal. Officer Shipley testified that when he interviewed defendant on the morning of the incident, she was very calm and seemed to be very well aware of where she was. She appeared normal in all senses. She did not appear to have any problem understanding her rights or in writing out her voluntary statement. Her replies to his questions were responsive. On cross-examination, he testified that during their interview defendant did mention voodoo spells and that she had been under the care of Dr. Barrionuevo.

Following the trial, defendant was convicted of attempted first degree murder and was sentenced to six years' imprisonment. She filed this timely appeal.

■ Defendant first contends that certain questions posed by the court during *voir dire* violated Supreme Court Rule 431 (107 Ill. 2d R. 431). Rule 431 provides that in criminal cases *voir dire* examination of jurors shall be conducted in accordance with Supreme Court Rule 234. Rule 234 provides:

"The court shall conduct the *voir dire* examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions. The court may acquaint prospective jurors with the general duties and responsibilities of jurors." 107 Ill. 2d R. 234.

The questions defendant complains of concern the insanity defense and the GBMI verdict. During *voir dire*, the trial court informed jurors that there might be evidence that defendant was insane at the time of the offense, and it asked them whether they would be

able to follow instructions concerning entry of a verdict of not guilty by reason of insanity. The court also asked jurors whether they could follow instructions concerning entry of a verdict of GBMI or whether they had "any quarrel with that proposition."

■ The *voir dire* questions defendant challenges were not improper as concerning "matters of law or instruction." The purpose of a *voir dire* is to select a fair and impartial jury. (*People v. Teague* (1982), 108 Ill. App. 3d 891, 894.) The insanity defense is a subject of intense controversy (*People v. Stack* (1986), 112 Ill. 2d 301, 313); parties have a right to have jurors specifically examined concerning the insanity defense when it is involved in a case (*People v. Jurczak* (1986), 147 Ill. App. 3d 206, 216). The same holds true for the GBMI verdict. The judge's questions were directed at ascertaining the jurors' attitudes toward and possible bias against the insanity defense and the GBMI verdict and determining whether they could follow the court's instructions on the law concerning these specific matters. As such the questions were proper. See *Stack*, 112 Ill. 2d at 311-13.

■ We note that, during *voir dire*, the trial court did inform the jurors that the State did not have to prove defendant was sane but, rather, that it was defendant's burden to prove by a preponderance of the evidence that she was insane at the time of the offense. Although these questions did preeducate the jury concerning the burden of proof on the insanity defense and, therefore, may technically violate Rule 234, defendant offered no objection at trial to these questions and has not made particular note of them in her brief. Furthermore, the questions do properly state the law, and we do not believe these questions affected the impartiality of the jury in any way by improperly indoctrinating the jury to either party's position; nor were they used as a means of impaneling a jury with a particular predisposition. (See *People v. Bowel* (1986), 111 Ill. 2d 58, 64.) In light of the fact that the jury had been informed during *voir dire* that the State had the burden of proving the elements of the crime beyond a reasonable doubt, we do not consider it prejudicial to defendant to inform the jurors that defendant had the burden of proving insanity by a preponderance of the evidence.

■ Defendant's major complaint concerning the *voir dire* questioning, however, centers on the fact that although the jurors were asked about the GBMI verdict during *voir dire*, the State later withdrew that verdict form and its attendant instructions. Defendant contends that the unexplained withdrawal of the GBMI verdict confused the jury and, thus, denied defendant a fair trial. Apparently, defendant believes that the *voir dire* questioning concerning GBMI preedu-

cated the jury to the possibility that defendant might be mentally ill (but not insane), yet jurors were never given a legal definition of mental illness which they could apply to the case.

Although jurors were questioned about the GBMI verdict during *voir dire*, we cannot assume from this that they were confused when no GBMI verdict form and instructions were provided. Nor has defendant suggested how this alleged confusion manifested itself. Following the evidence, the jury was given verdict forms for not guilty, not guilty by reason of insanity, and guilty and fully instructed on the law and the burdens of proof applicable to those verdicts. Defendant does not allege that the instructions the jury actually received were improper in any way. The jury apparently believed that the State had met its burden as to the elements and that defendant had not met her burden of proving insanity. There is simply no basis for defendant's contention that the jury was confused.

■■ ■ Defendant also contends that the trial court should have provided the jury with the GBMI instructions and verdict form even though the State had chosen to withdraw the verdict. Section 115—4(j) of the Code of Criminal Procedure of 1963 provides, in part:

"When the affirmative defense of insanity has been presented during the trial, the court, where warranted by the evidence, shall also provide the jury with a special verdict form of guilty but mentally ill, as to each offense charged and shall separately instruct the jury that a special verdict of guilty but mentally ill may be returned instead of a general verdict, but that such special verdict requires a unanimous finding by the jury beyond a reasonable doubt that the defendant committed the acts charged and that the defendant was not legally insane at the time of the commission of those acts but that he was mentally ill at such time." Ill. Rev. Stat. 1987, ch. 38, par. 115—4(j).

Submission of the GBMI instruction is discretional with the trial court. (*People v. McDarrah* (1988), 175 Ill. App. 3d 284, 297.) In this case, there was evidence that defendant had been hospitalized for mental problems several times over a 12-year period, and defendant's expert testified that defendant was insane at the time of the offense. However, neither party requested the GBMI verdict. The State apparently tendered the verdict and attendant instructions to the court but later withdrew them. Although the evidence may have warranted giving the GBMI verdict in this case, defendant has not alleged or demonstrated that failure to give this verdict prejudiced her case. She makes no representation that she would have been better off if the GBMI verdict were given here. Furthermore, contrary to defendant's

contentions, the State did not conduct its case on the GBMI theory. During its case in chief, the State offered no evidence concerning mental illness. Therefore, defendant's contention that the entire case was "tried on not guilty by reason of insanity versus [GBMI] basis" is not persuasive. We conclude that the trial court's failure to provide the GBMI verdict was not an abuse of discretion.

Defendant also contends that improper comments by the prosecution during final argument denied her a fair trial. The first error defendant points to is the assistant State's Attorney's comment in closing argument concerning defendant's failure to call her treating psychiatrist, Dr. Barrionuevo, as a witness. The assistant State's Attorney said:

> "We don't have to prove that she was sane. They have to prove by a preponderance of the evidence that she was insane. I submit to you that probably the best way to have proved that, to have sustained their burden, would have been to call Dr. Barrionuevo in here—."

The defendant objected to the comment, and the trial court instructed the jury to disregard the comment and advised the jury that the witness was equally available to both sides.

■■ ■ Although it is improper to comment on defendant's failure to call a nonalibi witness (*People v. Adams* (1985), 109 Ill. 2d 102, 120), defendant objected immediately, and the court instructed the jury to disregard the comment. Generally, such actions are considered sufficient to cure any prejudice from improper remarks. (*Webb v. Angell* (1987), 155 Ill. App. 3d 848, 853.) Defendant contends, however, that the prejudice was not cured as evidenced by the jury's request, during its deliberation, for defendant's hospital records. We fail to see a connection between this comment and the jury's request for the records. Before the comment was made, the jury knew that Dr. Barrionuevo was defendant's treating psychiatrist and that defendant had been hospitalized numerous times. If the jurors' request was prompted by attorney comment, we consider it more likely that it was prompted by defense counsel's own final argument statement concerning medical records. Defendant's attorney stated:

> "Now, Dr. Goldman testified in a great deal of detail actually to what is in all of the St. Therese Hospital records and what's in the discharge summaries prepared by Dr. Barrionuevo and about Dr. Barrionuevo's diagnosis and what treatment he was rendering. Dr. Barrionuevo's views are in the record. You'll have them."

This comment may have suggested to the jury that the hospital record

would be available to them during deliberation. We consider that any prejudice created by the prosecution's comment was cured by defendant's timely objection and the trial court's instruction to disregard the comment.

Defendant also points out that during rebuttal, the assistant State's Attorney misquoted defense counsel and stated a new definition of defendant's burden of proof on insanity. The challenged statement is as follows:

"First of all, he says to you that you only have to find by a preponderance of evidence that it was probably more that she was insane than sane, and I think to hear somebody say you only have to find by a preponderance really is not accurate. You have to find by a preponderance. There is no only about it. It's for you to determine what a preponderance is."

Defendant points out that defense counsel had never said "only" a preponderance and that the comment misstates the law in that it leaves to the jury the defining of preponderance. Defendant never objected to this comment at trial, however, and the issue is waived for appeal. (*People v. Teague* (1982), 108 Ill. App. 3d 891, 904.) Even if the issue were not waived, the comment did not prejudice defendant. During jury instructions, the court properly instructed the jury concerning the burden of proof and the definition of a preponderance of the evidence. These proper instructions cured any prejudice created by the prosecutor's comment.

Defendant also contends that she should have been allowed to open and close final arguments at trial because sanity was the only issue and defendant had the burden of proof on that issue. We disagree. The general rule is that the right to open and close is coexistent with the burden of proof, and where plaintiff has anything to prove in order to secure a verdict, the right to open and close belongs to him. (*McDarrah*, 175 Ill. App. 3d at 296.) In criminal cases, the prosecution has the burden of proving beyond a reasonable doubt all of the material and essential elements of the crime. (*People v. Fields* (1988), 170 Ill. App. 3d 1, 17.) "Even though defendant did not contest performance of the charged acts or the intent that accompanied them (thus refraining from putting them in issue), he need not have contested them or offered any evidence at all, yet the State was still required to prove them." (*Fields*, 170 Ill. App. 3d at 17.) Notwithstanding defendant's insanity defense and statutory obligation to prove that defense by a preponderance of the evidence, the State was not relieved of first proving defendant guilty beyond a reasonable doubt; therefore, because the State bore the primary burden of proof

here, the trial court properly allowed the State to open and close final arguments. See *McDarrah*, 175 Ill. App. 3d at 296.

■■■ Defendant also contends that she met her burden of proving insanity by a preponderance of the evidence and the jury's verdict of guilty is against the manifest weight of the evidence. The question of sanity is a question of fact, and the decision of the trier of fact will not be reversed unless it is contrary to the manifest weight of the evidence. (*People v. Martin* (1988), 166 Ill. App. 3d 428, 433.) Defendant contends that the State's psychiatric expert was inconsistent and not credible. She states that Dr. Tuteur based his opinion that defendant was sane at the time of the offense on a 1½-hour interview; that he never saw the hospital records before the day of trial; and that when he saw the hospital records he did not review the history of symptoms or complaints but only the diagnoses. Although Dr. Tuteur did not read defendant's hospital records before he formed his opinion on sanity, he did read Dr. Goldman's detailed summary of defendant's previous psychiatric hospitalizations and treatments. His opinion was based on this, as well as on the interview, the police report and defendant's statements.

Defendant also points out that when he was asked whether schizophrenia can sometimes be controlled by medication, Dr. Tuteur said it can be controlled and it can improve; yet, later, he said "a schizophrenic who allegedly had those symptoms years later would be much worse even in spite of treatment with medication and there is no worsening in [defendant's] condition." Apparently, defendant considers these statements contradictory. We disagree. The first statement admits that medication can help; the second says that over a prolonged period of time, however, there will be a worsening of the condition. We see no contradiction there.

Defendant also points out that defendant was taking neuroleptics to control delusions and hallucinations, apparently as evidence that Dr. Tuteur's conclusions about defendant's lack of delusions is not believeable. However, although the experts disagreed about whether defendant was schizophrenic and whether she was insane at the time of the offense, Dr. Goldman did agree with Dr. Tuteur that on the day of the incident defendant was not acting under the influence of delusions or hallucinations.

Additionally Dr. Tuteur's opinion that defendant was sane is supported by other evidence. There was lay testimony that defendant acted normally on the day before the incident and she appeared normal during the police interview following the incident. Further, there was evidence that defendant planned the shooting. She told Dr. Tu-

teur that she had been thinking about it for a few days. She intended to kill her husband and then herself. She told Officer Shipley that she meant to kill her husband so she waited for him to go to bed. The existence of a plan for a crime is a relevant factor in determining a defendant's sanity. *People v. Bouchard* (1989), 180 Ill. App. 3d 26, 34.

■■ Under these circumstances, we find no basis for disturbing the jury's finding that defendant failed to establish her insanity by a preponderance of the evidence.

■■ Finally, defendant contends that the Illinois scheme for dealing with defendants with mental problems is unconstitutional as a system. Although defendant refers to the interrelationship between the insanity defense and the GBMI verdict, we note that the GBMI verdict form was not used in this case; therefore, its constitutionality is not properly before us. Furthermore, the constitutionality of sections 3—2(b) and 6—2(e) of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, pars. 3—2(b), 6—2(e)), which give defendant the burden of proving insanity by a preponderance of the evidence, has been addressed by our courts before. The statutes have been found to be constitutional. Defendant has presented no new arguments in favor of her claim that the insanity defense statutes are unconstitutional. We consider that the court's prior decisions on the issue are dispositive, and we decline to reconsider it. See *People v. Clemons* (1989), 179 Ill. App. 3d 667; *People v. McDarrah* (1988), 175 Ill. App. 3d 284; *People v. Hightower* (1988), 172 Ill. App. 3d 678; *People v. Martin* (1988), 166 Ill. App. 3d 428.

For the above mentioned reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

INGLIS and DUNN, JJ., concur.