THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JERRY SINGER, Defendant-Appellant.

First District (1st Division)   No. 1—89—2668

Opinion filed December 6, 1993.

Randolph N. Stone, Public Defender, of Chicago (Alison Edwards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and David Stabrawa, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant Jerry Singer was indicted for the murders of decedents Cynthia Graeber, Alice Wendt and Dr. Francis Conrad. Defendant entered a plea of not guilty by reason of insanity. Following a jury trial, defendant was found guilty but mentally ill on all three murder charges. Thereafter, the circuit court found defendant fit for sentencing and sentenced him to natural life imprisonment.

Defendant appeals his convictions and sentence, alleging that the circuit court erred in allowing the following to be admitted: (1) alleged hearsay testimony that two of the decedents made repeated attempts to collect four months' unpaid rent from him; (2) evidence that two of the decedents intended to evict defendant where no evidence existed to show that defendant knew of their plan; (3) two hearsay documents which allegedly lacked proper foundation; and (4) rebuttal testimony which did not contradict or disprove anything raised by defendant. Defendant also argues that improper prosecutorial comments during closing argument denied him a fair trial. We reverse the convictions and vacate the sentence of the circuit court and remand this cause for a new trial.

At trial, the State's first witness, Toni Basille, testified that in early 1988, she worked as a leasing agent for the Cobbler Square Apartments located at 1350 North Wells in Chicago. Decedent Graeber was the building's property manager and decedent Wendt served as the assistant property manager. Graeber and Wendt were responsible for collecting the tenants' rents, running the front office and generally managing the property.

Basille testified that defendant was a Cobbler Square tenant in late 1987 and early 1988. She stated that she was familiar with the status of defendant's lease. Then, over defense counsel's objection,

Basille testified that defendant failed to pay his December 1987 rent and the monthly rents thereafter, through April 1988. According to her, Wendt and Graeber sent written correspondence and had several telephone conversations with defendant regarding his failure to pay rents. She testified that she was present during one of the telephone conversations between defendant and Wendt in December 1987.

Basille also testified that on April 5, 1988, she, Graeber and Wendt were at work. At about 1 p.m., defendant came into the management office, proceeded into Graeber's interior office and closed the door. Basille heard defendant and Graeber argue in loud voices for 5 to 10 minutes. Then they left Graeber's office, and the argument continued in the outer office. As defendant was exiting the outer office, Basille heard defendant call Graeber a "cunt" and comment that the management employees had "made his life miserable." Then, according to Basille, on April 6, 1988, through a conversation she had with Wendt and Graeber, she became aware of the fact that an eviction notice was going to be served on defendant on the following day.

On April 7, as Basille was arriving for work, she learned that Graeber and Wendt had been stabbed to death. She did not know whether defendant was actually served with the eviction notice. Basille did, however, identify an eviction notice dated December 9, 1987, which bore Graeber's signature and defendant's name.

During cross-examination, Basille explained that she did not know the dates and times on which Graeber allegedly contacted defendant about his rental problems and was not present for any of those alleged conversations. Basille also acknowledged that she did not know the dates or times when Wendt contacted defendant, with the caveat that she was present during a December telephone conversation between Wendt and defendant. The circuit court denied defendant's motion to strike Basille's testimony that Wendt and Graeber had participated in several telephone conversations with defendant regarding his delinquent rent payments. The circuit court reasoned that it was evident to the jury that Basille had no personal knowledge of the above-mentioned telephone conversations and that no purpose would be served by striking her testimony. The court further admonished that during closing argument, the State was to "stay away" from any argument that defendant had any conversations with Wendt or Graeber regarding rent, except for the one in December of which Basille had personal knowledge.

Next, Lisa Marie Conrad testified that on April 7, 1988, she was in Chicago with her father, decedent Conrad, looking for an apartment to rent. At about 10 a.m. on April 7, the Conrads arrived

at Cobbler Square and were shown apartments by leasing agent Paula Blythe. The three returned to the general office whereupon defendant entered the office. He proceeded to an interior office. Lisa testified that soon thereafter, she heard a woman screaming. As decedent Conrad walked towards the screaming, Blythe grabbed Lisa by the arm and stated that they had to get out of the office because defendant was "crazy." Blythe and Lisa left the office. They approached a police officer parked in his car outside the building and reported to him that "there was something going on" inside.

Lisa, Blythe and the police officer ran around to the front of the building, where they learned that someone in the office had been stabbed. Lisa ran into the office and found her father unconscious, bleeding severely, and not breathing. Her father died from his stab wounds.

Mark Contreras, a maintenance worker at Cobbler Square in April 1988, testified on behalf of the State that on April 7, at about 10:30 a.m., he was seated across from Graeber in her office when defendant entered, carrying a knife with a five- to six-inch blade. Defendant proceeded directly around the desk to where Graeber was sitting and, without a word, began stabbing her with the knife. Contreras picked up and threw a few chairs at defendant, but he continued to stab Graeber and did so even after she fell to the ground. Contreras fled Graeber's office, pausing when he saw Wendt on the telephone in the outer office, to tell her to "get the hell out of there." Contreras thought Wendt was following him out of the office.

James Floyd, also a maintenance worker at Cobbler Square in April 1988, testified that during the morning hours of April 7, as he was passing the management office, he saw Contreras coming out of the office and yelling at Wendt to "get the hell out of the office." Floyd went into the office and saw defendant stabbing Conrad. Floyd picked up a chair and hit defendant with it. He further testified that he saw defendant kneeling over Wendt but did not see him actually stabbing her. Then, defendant looked at Floyd and fled on foot. Conrad, Graeber and Wendt all died from multiple stab wounds.

Blythe, the leasing agent who was showing apartments to the Conrads on the day of the killings, testified that on April 7, 1988, at about 10:30 a.m., she and the Conrads were in the outer office of the Cobbler Square Apartments when defendant banged the door open. Blythe stated that defendant proceeded to Graeber's office, and soon thereafter, she heard Graeber screaming. Blythe testified that she knew defendant was a "problem tenant" because he was not paying his rent. Blythe also stated that she was aware of the fact that Graeber and Wendt had contacted defendant concerning his rent payments.

Chicago police officer Chris Karedas testified that he responded to a call at Cobbler Square at about 10:30 a.m. on April 7, 1988. Karedas met Floyd, who directed him to defendant's apartment. Karedas and other officers knocked on defendant's door. When no one answered, they forced the door down. Defendant was sitting on the floor in an empty apartment with a bloody knife lying to his right. Defendant was ordered to step away from the knife, lie on the floor, and put his hands behind his back; he complied. Defendant was then handcuffed, placed under arrest and escorted from the apartment. On the way out, defendant twice said to Karedas, "I had to do it."

Chicago police officer Cary Orr also testified that on April 7, 1988, he was sent to Cobbler Square to investigate a homicide. Defendant had already been arrested, and Orr was searching defendant's apartment. A few feet from a telephone, Orr saw a Chicago yellow page directory opened to the listings for gun stores. Orr also found the December eviction notice on the floor and an index card with an address and telephone number written on it, matching that of Shore Galleries gun shop in Chicago. In addition, Orr found a bill from Chicago Allied Warehouse, which bore an April 6, 1988, date and defendant's name. The December eviction notice and furniture storage bill were admitted into evidence over defendant's objections.

Anthony Boze testified that in April 1988, he was working as field and stream department manager at Sportmart. At that time, Sportmart sold rifles and shotguns but not handguns. On April 7, 1988, at 9:40 a.m., while at work, Boze observed defendant standing in front of a gun case. Defendant asked to see a short-barrel model shotgun. Boze responded by inquiring whether defendant had an Illinois firearm owner's identification card. Defendant replied he did not. Boze then informed defendant that he could not show him any guns without such a card. Defendant next asked to see some knives, and Boze directed him to a knife case. However, he left without making a purchase.

Next, Anthony Gray testified that in April 1988, he worked as a salesman in the fishing department at MC Mages sports store. On April 7, right after the store had opened, Gray assisted defendant in purchasing a knife from a display case. Gray showed him two knives, and defendant purchased the larger of the two. While Gray was assisting defendant, he told Gray that he was not going hunting with the knife.

Defendant presented his insanity defense by calling several experts. Dr. Edward Blumstein, a licensed clinical psychologist and director of the psychology department at the psychiatric institute, testified on defendant's behalf. Blumstein had interviewed defendant

for three hours and consulted police reports and defendant's court-reported statement before reaching his conclusion that defendant was suffering from paranoid schizophrenia, rendering him legally insane on the day of the killings. Blumstein testified that defendant believed psychics were conspiring to drive him crazy and harm him in whatever way possible. Blumstein further commented that defendant was "one of the craziest people" he had ever met.

Dr. Albert Stipes, a licensed psychiatrist with the psychiatric institute of the circuit court of Cook County, testified that on August 10, 1988, he examined defendant pursuant to a court order. Prior to examining defendant, Stipes reviewed the police reports and medical records from St. Francis Hospital, Evanston Hospital and the Cermak jail. Additionally, Stipes reviewed Blumstein's report. Stipes also came to the same conclusion as Blumstein; defendant was legally insane the day of the killings. Stipes testified that defendant's mental disease caused him to believe that "he was being persecuted by someone with a psychic ability who was influencing his thoughts, controlling his behavior, and was able to read his thoughts." Stipes further stated that defendant was also suffering from "Capgras Syndrome," a condition in which defendant believed that people he knew were replaced by doubles.

Stipes and Blumstein supported their conclusions by citing to defendant's 1986 mental health records from Evanston and St. Francis Hospitals which indicated that a psychiatrist had diagnosed defendant as having major depression and undifferentiated schizophrenia. Although the Evanston Hospital records indicated that defendant's prognosis was poor to fair, he was, nevertheless, released after 30 days, and received no treatment after his discharge. The Cermak jail's records indicated that defendant was diagnosed as suffering from major depression with psychotic features and paranoid schizophrenia. Blumstein further testified that his conclusions were supported by the results of the Rorschach ink blot test and the Minnesota Multifacet Personality Inventory he had performed on defendant.

Similarly, Dr. Robert Reifman, a licensed physician, board-certified psychiatrist and director of the psychiatric institute, testified that he, too, had reviewed the above reports and documents and had examined defendant in March and May 1989. Reifman's explanation of defendant's symptomology was consistent with that given by Blumstein and Stipes; namely, that defendant believed he was being controlled by forces outside himself and that the people around him were being influenced to be against him. Reifman added that defendant believed other people were just clones.

Reifman ultimately opined that defendant was legally insane on April 7, 1988, because, on that date, he believed that psychics were out to "get him," to cause him to lose his apartment, and were influencing those people who ran the apartment building to throw him out on the streets. Reifman explained that defendant acted in self-defense to what he perceived to be an attack on him.

Defendant rested, and the State called Steve Soistman as a rebuttal witness. In April 1988, he also worked at Sportmart in the hunting and fishing department. On April 7, at about 9:45 a.m., defendant asked Soistman to show him a gun. When Soistman discovered that defendant did not have an Illinois firearm owner's identification card, he offered to give defendant an application. Defendant, however, responded that it was "not going to do [him] any good. [He] need[ed] to buy a gun." Then, defendant requested that Soistman show him a survival knife, which had a heavy eight-inch blade. Soistman refused to sell him the knife, and defendant left the store.

Dr. Werner Tuteur, a licensed psychiatrist in private practice, also testified as a rebuttal witness for the State. Tuteur stated that in the fall of 1988 and spring of 1989, he interviewed defendant for four hours, after having reviewed the police reports and defendant's court-reported statement. Based on his interview and the above information, Tuteur opined that on April 7, 1988, defendant suffered from no mental disease and was not legally insane. Tuteur supported his opinion by pointing out that defendant's court-reported statement contained no mention of psychics. Tuteur believed this omittance to be clinically significant because paranoid schizophrenics usually "bubble over" with their delusions. He also explained that defendant's attempt to purchase a gun and knife immediately prior to killing the decedents and locking himself in his room after the murders demonstrated that defendant had specific intent to kill and that he knew what he did was wrong. Tuteur further cited defendant's 3 1/2 years of college during which defendant obtained an associate's degree and had no apparent difficulty studying as an indication that he was not suffering from mental disease.

At the close of the evidence and instructions, the jury returned a verdict of guilty but mentally ill. A hearing to determine whether defendant was fit for sentencing was subsequently held. At that hearing, Stipes and Tuteur gave conflicting opinions as to defendant's fitness. The circuit court found defendant fit for sentencing and sentenced him to natural life imprisonment. Defendant now appeals.

On appeal, defendant's first argument is that Basille's hearsay testimony that Graeber and Wendt repeatedly had telephone

conversations with him regarding delinquent rent payments denied him a fair trial. Over defendant's objections, Basille was allowed to testify that several times defendant failed to pay his rent, that on one occasion Wendt served him with an eviction notice, that Wendt and Graeber made further contact with him "through written notices and telephone calls" and that when defendant failed to pay his rent in April 1988, a decision was made to serve him with an eviction notice. The circuit court also denied defendant's motion to strike Basille's testimony about all conversations between the defendant and Graeber or Wendt except the single telephone call of which Basille had personal knowledge.

■ Hearsay is "testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter." (*People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223.) In the present case, the identity of the out-of-court declarant is not clear, because there is no evidence relating to who informed Basille that there were multiple conversations between defendant and Graeber and Wendt regarding unpaid rents and that written notices were sent to defendant. Moreover, Basille was not present for any of the alleged telephone conversations except one. Since the declarant is unknown and the witness lacked personal knowledge, we find the statements regarding several alleged telephone conversations are inadmissible hearsay. See *People v. Hunter* (1984), 124 Ill. App. 3d 516, 464 N.E.2d 659.

The State argues that even if the above is inadmissible hearsay, the admission of such was harmless error. We disagree. Harmless error is "an error committed in the progress of the trial below *** which was not prejudicial to the rights of the party assigning it." (*People v. Jenkins* (1991), 209 Ill. App. 3d 249, 257, 568 N.E.2d 122.) In the instant case, the complained-of testimony was offered to show that Graeber and Wendt had numerous unfriendly contacts with defendant over a four-month period immediately prior to the killings. This evidence strongly suggested that defendant was driven by malice and revenge, as opposed to mental disease, to kill the decedents. Additionally, the State compounded the error by broaching the subject during closing argument despite the circuit court's admonishment and the State's agreement not to argue the subject. The State argued:

> "I don't believe [defendant] can kill Alice Wendt, come in here and say to you well where's Alice Wendt to testify to all these phone contacts.
>
> Is there any doubt in your mind from all the evidence that you've heard that for the four months the defendant was late

with his rent he wasn't contacted repeatedly by [Graeber and Wendt]."

At that point, defendant objected. The circuit court overruled the objection, commenting that the "jury has heard the evidence, counsel." As a result, the error was compounded three times: first, by the circuit court's overruling defendant's initial objection to the testimony and denying his motion to strike; second, by the State's closing argument; and third, by the circuit court overruling defendant's objection during closing argument. We, therefore, refuse to find that the admission of the complained-of evidence is harmless.

Defendant's second argument is that evidence relating to the allegation that Graeber and Wendt intended to evict defendant on the day that he killed them denied him a fair trial. Defendant specifically argues that the evidence was improperly admitted because there was no showing that he knew of their eviction plan. Basille testified that on April 6 she discussed Graeber's and Wendt's plan to evict defendant on the following day. The clear purpose of this evidence was to suggest to the jury that defendant killed Graeber and Wendt on April 7 because they were going to evict him on that day. However, the State failed to produce any evidence that defendant knew of this plan.

This issue is analogous to the issue in *People v. Wilson* (1987), 116 Ill. 2d 29, 506 N.E.2d 571, where the supreme court found that the defendant was denied a fair trial because the circuit court allowed the admission of evidence of an outstanding arrest warrant at the time the defendant killed police officers. The supreme court commented that the State introduced the evidence to show that the defendant had a motive for killing the police officers, *i.e.* to avoid an arrest. But, the State failed to produce any evidence that the defendant knew that the warrant existed, or even that the officers were arresting him pursuant to a warrant. The supreme court found that the existence of the warrant did not by itself show that the defendant was trying to avoid apprehension. It held that "[u]nless the defendant knew about the warrant or knew that the officers were attempting to arrest him, the existence of the warrant does not establish anything about the defendant's state of mind." *Wilson*, 116 Ill. 2d at 52, 506 N.E.2d at 581.

■ Similarly, there was no evidence that defendant knew that Graeber and Wendt had planned to evict him on the day of the killings. The evidence of the eviction plan did not establish anything about defendant's mind and served only to prejudice the jury against him. Accordingly, we hold that the evidence of Graeber's and Wendt's plan to evict defendant was improperly admitted.

Next, defendant argues that the furniture storage bill and the December eviction notice found in his apartment at the time of his arrest were improperly admitted into evidence because the State did not lay a proper foundation for their admission and, further, because such evidence is hearsay. The State, on the other hand, argues that the appropriate foundation was laid for the documents and that they were properly admitted to prove defendant's state of mind.

Section 115—5(a) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—5(a) (now 725 ILCS 5/115—5(a) (West 1992))) provides for the admission of business records as follows:

> "(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

> All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility."

■ The State failed to lay a proper foundation in accordance with the above statute when attempting to authenticate the December eviction notice as a business record. The State never asked Basille whether she had knowledge of Cobbler Square's procedure when tenants failed to pay their rent, and if she did have such knowledge, to explain it to the court. (See *Central Steel & Wire Co. v. Coating Research Corp.* (1977), 53 Ill. App. 3d 943, 369 N.E.2d 140.) No proper foundation was laid for the admission of the eviction notice as a business document, and without such foundation, it was error to admit it into evidence.

Turning now to the furniture storage bill allegedly found in defendant's apartment at the time of his arrest, the State contends that the document was admitted to show defendant's state of mind, a non-hearsay purpose, not for the truth of the matter asserted therein. We disagree. Clearly, the furniture storage bill, along with the eviction notice, was admitted to provide an arguably rational motive for the killings. The above documents would tend to show motive only if their contents were true. Thus, the furniture storage bill would only be relevant if defendant, did in fact, store his furniture. We find that the bill was introduced for the truth of its contents and, therefore, is hearsay because the person who purportedly wrote out the receipt

was not under oath and subject to cross-examination. Furthermore, it does not fall under the hearsay exception of a business document because it was not authenticated as such. Since motive cannot be proven by hearsay evidence, we hold that the circuit court erred in admitting the furniture storage bill into evidence. See *People v. Harbold* (1984), 124 Ill. App. 3d 363, 464 N.E.2d 734.

■ Defendant's fourth contention on appeal is that the testimony of Soistman, concerning defendant's actions at Sportmart, was improper rebuttal testimony because it failed to contradict or disprove anything raised by defendant. Although defendant objected to Soistman taking the stand because he was not listed on the State's answer to discovery, defendant never objected to any of the contents of his testimony at trial. The Illinois Supreme Court has held that to preserve an issue for appeal there must be a specific contemporaneous objection raised at trial and in a written post-trial motion. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) As a result of defendant's failure to object to Soistman's testimony on the grounds that it did not contradict or disprove anything raised by defendant, he has waived the issue on appeal. (See *Enoch*, 122 Ill. 2d 176, 522 N.E.2d 1124.) We refuse to consider this issue under the plain error doctrine because the admission of this witness' testimony was not prejudicial enough to deprive defendant of a fair trial. See *People v. Herrett* (1990), 137 Ill. 2d 195, 561 N.E.2d 1.

Defendant's last issue on appeal is that numerous prosecutorial comments during closing argument denied him a fair trial. Defendant acknowledges that he has failed to properly preserve for review most of his objections to closing argument. He, however, requests that we consider the issues under the plain error doctrine. The State argues that we need not do so because

> "none of the alleged errors deprived defendant of any substantial means of enjoying a fair and impartial trial, nor was this a case where the evidence was closely balanced such than [*sic*] an error tipped the balance between a guilty and not guilty verdict. (See *People v. Palmer* (1989), 188 Ill. App. 3d 414, 545 N.E.2d 743.) \*\*\* Moreover, the evidence against defendant was so overwhelming as to render any possible error harmless."

Unlike the admission of Soistman's testimony, if the State's closing remarks were improper, when combined with the other errors committed throughout the trial, the cumulative effect would be that defendant was deprived of his right to a fair and impartial trial. Moreover, the evidence against defendant was not overwhelming. Defendant pleaded not guilty by reason of insanity and the evidence of defendant's sanity was anything but overwhelming. Three expert

witnesses found defendant to be psychotic, suffering from paranoid schizophrenia. Treating physicians at St. Francis and Evanston Hospitals similarly diagnosed defendant. Defendant's records from Cermak jail also indicate that he suffered from mental disease. Drs. Reifman, Stipes and Blumstein each opined that defendant was insane when he killed the decedents. In fact, Dr. Blumstein described defendant as "one of the craziest people I've seen."

On the other hand, the only evidence that defendant was sane at the time of the killings was Dr. Tuteur's, the State's expert witness', testimony. We, however, are not swayed by Tuteur's testimony as an expert witness or by his medical opinion that defendant was sane at the time of the commission of the killings. After reviewing cases in which Tuteur has testified, we feel compelled to discuss his history as an expert witness.

In *People v. Allen* (1984), 101 Ill. 2d 24, 461 N.E.2d 337, Dr. Tuteur examined the defendant at the State's request and found no mental condition which would prevent him from assisting in his defense, even though five separate attorneys and another psychiatrist felt that the defendant was unable to cooperate with counsel. Thereafter, the defendant pleaded guilty and was sentenced to death. Subsequent investigation showed that the defendant had earlier in his life had part of his brain removed during surgery for a depressed skull fracture, a condition never noted by Dr. Tuteur.

In *People v. Engram* (1990), 193 Ill. App. 3d 511, 549 N.E.2d 1333, Tuteur testified in an attempted murder case and found no evidence of any disabling mental disease, despite defendant's 12-year history of psychiatric problems, including five separate hospitalizations, a diagnosis of paranoid schizophrenia, and defendant's belief that she and her husband were under a voodoo spell. Tuteur testified that the defendant had "no past symptoms" because she could not describe them adequately.

We especially note Tuteur's testimony in *People v. Jones* (1982), 109 Ill. App. 3d 120, 440 N.E.2d 261, because of its relevancy to the instant case. In *Jones*, Tuteur testified on behalf of the defendant that the fact that an offender acts with a motive does not indicate he has a sound mind and further, that planning a crime does not demonstrate that a person understands the consequences and criminality of his acts. In the case at bar, however, Dr. Tuteur testified that defendant had

> "specific intent to do what he was going to do, namely he went to a gun shop on the morning of the offense, tried to purchase a gun which he was refused because he had no license.
> He then instead bought a hunting knife or some kind of a large

knife. He then went to another store, once more trying to purchase a weapon, a gun, a firearm which was again unsuccessful. And furthermore, after the offense, he fled to his room and locked himself up, obviously having had knowledge of what he had done." Thus, the medical opinion in the present case contradicts the opinion Tuteur gave in *Jones*. When asked, in the present case, why it is relevant that defendant had specific intent and knowledge in determining defendant's sanity, Tuteur replied that he had "never had a case who had specific intent, prepared his crime, had it premeditated, carried it out and at the same time was insane not realizing the criminality of his act." This is a misstatement of Tuteur's case history.

■ Notwithstanding this court's opinion of Tuteur's testimony, the evidence in this case against defendant was not overwhelming when the defendant's three experts' testimonies and various hospital and jail records are taken into account. At the very least, the evidence of defendant's sanity is balanced. Since the evidence against defendant is not overwhelming, and the cumulative effect of these remarks, if improper, would be to have denied defendant a fair trial (see *Herrett*, 137 Ill. 2d at 209-10, 561 N.E.2d at 7-8, citing *People v. Carlson* (1980), 79 Ill. 2d 564, 567-77, 404 N.E.2d 233, 238), we consider the closing argument issues under the plain error doctrine.

The first comment of which defendant complains regards his use of the insanity defense and is as follows:

"Ladies and gentlemen, when he chose this defense, he wasn't bargaining with a very big stick. He didn't have a whole lot of choices available to him. So he picked this defense called legal insanity.

And the way it works is he says, which he can't deny from the evidence, I did it. I killed the three people. But let me go because I couldn't control myself."

Defendant correctly points out that argument that a defendant found not guilty by reason of insanity will be released is a misstatement of the law. (*People v. Wilson* (1983), 120 Ill. App. 3d 950, 458 N.E.2d 1081; *People v. Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081.) It implies that a verdict of not guilty by reason of insanity would result in defendant being released. The complained-of remark was improper. The State's contention that the argument was not so prejudicial as to deprive defendant of a fair trial because the evidence of guilt was overwhelming is meritless as discussed above.

Defendant further argues that other remarks by the State implied that he and his attorneys attempted to confuse the jury in order to procure a not guilty verdict and "escape responsibility". The State commented that

"over the past fourteen months while this case was pending, he spun a web of confusion. A web, a plan on his part to confuse. A plan that's detailed to escape responsibility for what he did on April 7."

There is no evidence in the record that defendant intentionally attempted to confuse anyone. In fact, the evidence indicates that defendant had a history of mental disease. Since there was nothing in the record to support the State's argument, it was improper. See *People v. Emerson* (1983), 97 Ill. 2d 487, 455 N.E.2d 41.

Citing *People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 465 N.E.2d 107, defendant argues that the State's comment that defendant's insanity "only lasts the time it takes to commit the crime. What kind of defense is that?" was improper. We agree. Defendant never claimed that his insanity lasted only for a few minutes. Defendant presented substantial evidence that he had suffered mental disease for several years.

Defendant's final argument with respect to the State's closing remarks is that the State improperly appealed to the passion of the jury and urged them to disregard the law by arguing that

"[w]here there is no responsibility, there's no security for any of us. Where there is a crime and no punishment, none of us are safe. And where we ignore the voices of Cynthia Graeber, Francis Conrad and Alice Wendt, then there is no humanity. And where none of these exists then there is no justice."

This statement does urge the jury to disregard the law when dealing with those persons who are not criminally responsible because of mental disease. (See Ill. Rev. Stat. 1987, ch. 38, par. 6—2(a) (now 720 ILCS 5/6—2(a) (West 1992)).) This argument was improper.

We find that the cumulative effect of all the errors discussed in this opinion resulted in such prejudice to the defendant that he was denied a fair and impartial trial. (See *Hunter*, 124 Ill. App. 3d at 549, 464 N.E.2d at 684, citing *People v. Brown* (1983), 113 Ill. App. 3d 625, 447 N.E.2d 1011.) Since the jury's verdict may have been different had the improprieties not occurred (see *Hunter*, 124 Ill. App. 3d at 549, 464 N.E.2d at 684, citing *People v. Panczko* (1980), 86 Ill. App. 3d 409, 407 N.E.2d 988), we reverse defendant's convictions, vacate his sentence and remand this cause for a new trial.

Reversed, vacated and remanded for a new trial.

MANNING, P.J., and O'CONNOR, J., concur.